ACCEPTED
14-14-00589-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/8/2015 6:57:49 PM
CHRISTOPHER PRINE
CLERK

## NO. 14-14-00589-CV

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/8/2015 6:57:49 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOURTEENTH JUDICIAL DISTRICT
HOUSTON, TEXAS

## 1717 BISSONNET, L.L.C.,

Defendant/Appellant/Cross-Appellee

vs.

## PENELOPE LOUGHHEAD, ET AL.,

Plaintiffs/Appellees/Cross-Appellants

_____

On Appeal from Case Number 2013-25155,
in the 157th Judicial District Court, Harris County, Texas

## BRIEF OF PENELOPE LOUGHEAD, ET AL., AS CROSS APPELLANTS

**REYNOLDS FRIZZELL LLP**
Jean C. Frizzell
State Bar No: 07484650
Jeremy Doyle
State Bar No: 24012553
Solace K. Southwick
State Bar No. 11522150
1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Telephone: (713) 485-7200
Facsimile:  (713) 485-7250
jfrizzell@reynoldsfrizzell.com
jdoyle@reynoldsfrizzell.com
ssouthwick@reynoldsfrizzell.com
**ATTORNEYS FOR**
**PLAINTIFFS/APPELLEES/CROSS-**
**APPELLANTS**

## ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

In compliance with Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellees/Cross-Appellants provide the following list of the parties to the appeal at issue, and the names and addresses of trial and appellate counsel for the parties:

**PLAINTIFFS/APPELLEES/CROSS-APPELLANTS:**
Luong Nguyen Plaintiffs/Appellees
Lam Nguyen and Katherine Hoang, jointly
Jamie Flatt
Penelope Loughhead
Donald Verplanken
Norman and Suannah Rund, jointly
Achim and Diana Bell, jointly
Jeanne Meis
Mary Van Dyke
Ralph and Leslie Miller, jointly
Yin and Surong Zhang, jointly
Martha Gariepy
Stephen Roberts
Suzanne Powell
Michelle Jennings and Michael Tetzlaff, jointly
James and Allison Clifton, jointly
Kimberly Bell
Richard and Mary Baraniuk, jointly
Kenneth Reusser and Xanthi Couroucli, jointly
Earle Martin
Dinzel Graves
Sarah Morian
Michael Clark
Marc Favre-Massartic
Raja Gupta
Laura Lee & Dico Hassad
Peter & Adriana Oliver
Ed Follis
Frank & Jeanette Stokes
Steven Lin
Yi-Wen Michelle Pu
Howard Epps
Phyllis Epps

**COUNSEL FOR PLAINTIFFS/APPELLEES/CROSS-APPELLANTS:**

REYNOLDS FRIZZELL LLP
Jean C. Frizzell
Jeremy Doyle
Solace K. Southwick
James A. Schuelke
1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Telephone: (713) 485-7200
Facsimile: (713) 485-7250
jfrizzell@reynoldsfrizzell.com
jdoyle@reynoldsfrizzell.com
ssouthwick@reynoldsfrizzell.com
jschuelke@reynoldsfrizzell.com


**DEFENDANT/APPELLANT/CROSS-APPELLEE:**
**1717 BISSONNET, LLC**

**COUNSEL FOR DEFENDANT/APPELLANT/CROSS-APPELLEE:**

VIADA & STRAYER
Ramón G. Viada III
17 Swallow Tail Court
The Woodlands, Texas 77381
Telephone: (281) 419-6338
Facsimile: (281) 419-8137
rayviada@viadastrayer.com

WILSON, CRIBBS & GOREN, P.C.
H. Fred Cook
2500 Fannin Street
Houston, Texas 77002
Telephone: (713) 222-9000
Facsimile: (713) 229-8824
hfcook@wcglaw.net

**TABLE OF CONTENTS**

                                                                    **Page(s)**

IDENTITY OF PARTIES AND COUNSEL ............................................................i

TABLE OF CONTENTS.................................................................... i - v

TABLE OF AUTHORITIES .................................................................vi

STATEMENT OF THE CASE...............................................................1

STATEMENT REGARDING ORAL ARGUMENT ...........................................2

ISSUE PRESENTED..........................................................................3

STATEMENT OF FACTS ....................................................................3

    A.    The Project is Announced, and the City and Neighborhood React .....3

    B.    The City and Buckhead Reach a Settlement.........................................7

    C.    The Hunt investment .................................................................8

    D.    The Construction Issues Committee and the Pre-Suit Effort to Obtain Information ...............................................................9

    E.    Plaintiffs file suit, and the suit proceeds quickly to trial....................11

    F.    The evidence at trial demonstrated that the Developer acted in bad faith in its dealings with the City of Houston, the residents of the neighborhood, the Court ...........................................14

        1. Buckhead's internal emails demonstrate that it never intended to comply with the Settlement Agreement......................14

          a. Buckhead artificially manipulated the trip count to make it look lower..........................................................14

          b. Buckhead planned to circumvent the green screen requirement................................................................16

2. Buckhead's internal emails demonstrated a general willingness to submit false documents to the City ...........................................17

3. Morgan testified that he did not keep his promises .......................18

4. The Developer engaged in sharp trial practices, including introducing misleading testimony and last-minute production of highly misleading evidence...........................................................19

G. The jury finds unanimously that the Ashby High Rise will be a nuisance if built ....................................................................24

H. In spite of the jury's unanimous finding of nuisance, and in spite of the evidence of the Developer's willingness to mislead the City and the neighborhood, the trial court denied Plaintiffs' request for permanent injunction ......................................25

SUMMARY OF ARGUMENT ..........................................................................25

ARGUMENT ...................................................................................................26

A. The trial court erred in balancing the equities.....................................28

1. The trial court improperly penalized Plaintiffs for failing to prove what would not constitute a nuisance .............................28

2. The trial court's determination that an injunction would harm the Developer is not supported by the evidence ........................32

3. The Trial Court's determination that an injunction would cause harm to the community is not supported by the evidence ........33

4. The Trial Court ignored the evidence that the Developer misled the City to obtain permits for the project.................................35

5. The Trial Court's determination that Plaintiffs delayed in bringing this lawsuit is not supported by the evidence.............36

B.       The Trial Court erred in holding that Plaintiffs have an adequate remedy at law ...................................................................................38

C.       The Trial Court erred in penalizing Plaintiffs for the actions of anonymous protesters .........................................................................39

CONCLUSION AND PRAYER ................................................................................39

CERTIFICATION OF COMPLIANCE .....................................................................40

CERTIFICATE OF SERVICE ..................................................................................41

APPENDIX

1.     Trial Court's Judgment

2.     Trial Court's Opinion

3.     Jury Charge

4.     Plaintiff's Exhibit 361 – Building Impact Categories

5.     Plaintiff's Exhibit 363 – Damage Impact to Homes

# TABLE OF AUTHORITIES

**CASES**                                                           **PAGE**

*Assembly of God Church of Tahoka v. Bradley*
    196 S.W.2d 696 (Tex. Civ. App.—Amarillo 1946, no writ) ........................27

*Champion Forest Baptist Church v. Rowe*
    1987 WL 5188 (Tex. App. – Houston [1st Dist.] Jan. 8, 1987, no writ) . 30-31

*Freedman v. Briarcroft Property Owners, Inc.*,
    776 S.W.2d 212 (Tex. App.—Houston [14th Dist.] 1989, writ denied) ..26, 30

*In re American Homestar of Lancaster, Inc.*
    50 S.W.3d 480 (Tex. 2001) ....................................................................27

*Pool v. River Bend Ranch, LLC*
    346 S.W.3d 853 (Tex. App.—Tyler 2011, pet. denied) ................................29

*Rowe v. Moore*
    756 S.W.2d 117 (Tex. App.—Houston [1st Dist.] 1988, no writ) ..................30

*Spiller v. Lyons*
    737 S.W.2d 29 (Tex. App.—Houston [14th Dist.] 1987, no writ)................26

*Stein v. Killough*
    53 S.W.3d 36 (Tex. App.—San Antonio 2001, no pet.) ..............................38

*Roberts v. Williamson*
    111 S.W.3d 113 (Tex. 2003) ....................................................................34

**STATUTES**

TEX. CIV. PRAC. & REM. CODE § 65.011(5) ......................................................27, 38

Tex. R. Civ. P. 13.............................................................................................37

## STATEMENT OF THE CASE

Penelope Loughhead, together with 44 of her neighbors, who are the owners of 30 homes in the Southampton and Boulevard Oaks neighborhoods in Houston ("Plaintiffs"), sued 1717 Bissonnet, LLC (the "Developers"), a real estate development entity that owns a 1.6 acre tract of land in a residential neighborhood. The Developers plan to construct a massive, 21-story mixed-use development on that property (the "Ashby High Rise"). Plaintiffs alleged that the Ashby High Rise, if built, will constitute a nuisance.[1] Plaintiffs sought a permanent injunction and, in the alternative, damages.[2]

The 157th Judicial District Court, Judge Randy Wilson presiding, conducted a several-week jury trial. At the close of the evidence, the trial court submitted a charge containing two questions that closely tracked the Texas Pattern Jury Charge for a nuisance claim.[3] The first question asked whether the Ashby High Rise would be a nuisance, if built; the second question inquired about damages.[4] The jury rendered a unanimous verdict finding that the development would constitute a nuisance as to 20 of the 30 plaintiff households. The jury awarded damages totaling

---

[1] Clerk's Record ("CR") at 417-433.
[2] *Id.*
[3] *Id.* at 730-40.
[4] *Id.*

1

approximately $1.6 million, based on lost market value of the Plaintiffs' homes and loss of use and enjoyment resulting from the nuisance.[5]

After the verdict, the trial court heard additional testimony and argument relating to Plaintiffs' request for a permanent injunction.[6] The court denied the requested injunction with a written opinion and entered judgment awarding only that portion of the damages relating to lost market value.[7]

The Developers appealed the judgment and the award of damages, and Plaintiffs cross-appealed the trial court's denial of permanent injunctive relief in light of the jury's finding of nuisance.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs submit that the common law claim of nuisance is well-established, and the trial court submitted jury questions and instructions that are contained in and fully supported by the Texas Pattern Jury Charge. Nevertheless, this appeal and cross-appeal involve complicated questions of the proper balance of equities when a construction project will cause physical damage to neighboring homes, among other impacts, and a unanimous jury determines that the project will constitute a

---

[5] *Id.*

[6] *See* Reporter's Record, Volumes 17 and 18. Citations to the Reporter's Record are formatted "RR" followed by the volume number, the page number and the line number. For example, RR1 1:1-10 would refer to Reporter's Record, Volume 1, page 1, lines 1 through 10.

[7] CR 1271-74.

nuisance if it is built.  Plaintiffs request oral argument because they believe that it will assist the Court in resolving these questions.

## ISSUE PRESENTED

The following issue is presented by this cross-appeal:

> Given the jury's finding that the Ashby High Rise would constitute a nuisance harming Plaintiffs' property rights as neighboring homeowners, did the trial court abuse its discretion in denying a permanent injunction against the construction of the Ashby High Rise when the court's analysis imposed a burden on Plaintiffs beyond that required by Texas law, made findings that are not supported by the evidence, and ignored the substantial evidence of wrongdoing?

## STATEMENT OF FACTS
### A. The Project is Announced, and the City and the Neighborhoods React.

In the summer of 2006, an entity known as Buckhead Investment Partners, LLC ("Buckhead"),[8] contracted to purchase the entity that owned a 1.6 acre lot at the corner of Bissonnet Street and Ashby Street.[9]  At the time of the purchase, the property was the site of the Maryland Manor apartments, a two-story apartment complex with 67 apartments.[10] By the end of the first quarter of 2007, Buckhead had

---

[8] Matthew Morgan and Kevin Kirton are principals in and sole owners of Buckhead.  *See, e.g.*, DX 104.  Each of their wives served as officers in the entity.  *Id.*
[9] RR3 101:6-12; DX 131; RR10 227:20-228:17.
[10] DX 131; R3 275:19-25; 292:16-19.

developed a plan to replace the two-story apartment structure on the 1.6 acre property with a high rise mixed-use building.[11]

Buckhead's principals admitted that from the earliest stages of development they knew the planned high rise would constitute "a departure in scale from the surrounding properties."[12] Morgan and Kirton fully anticipated heated neighborhood opposition, believing that the likelihood of such opposition was "great."[13]

Morgan and Kirton's prediction of neighborhood opposition was well-founded. As soon as Buckhead publicly announced its plan to construct a 23-story[14] multi-use high rise on the site, many residents of the neighborhood began to voice their objections. DX 34. The trial court aptly described the neighborhood opposition as "rapid and intense."[15] A neighborhood meeting in 2007, shortly after Buckhead announced the project, drew over 500 people, including four city officials, and four representatives of other city and state officials.[16] Two Houston mayors

---

[11] RR3 89:12-25.
[12] DX 122.
[13] *Id.*; RR3 91:5-10.
[14] The original plan was to build a 23-story structure, *see, e.g.,* DX 122, but the size was ultimately reduced pursuant to a settlement with the City of Houston to 21 stories.
[15] CR 1199.
[16] RR3, 98: 8-15

weighed in against the project, Mayor Bill White and Mayor Annise Parker.[17] A neighborhood group called "Stop Ashby High Rise" formed.[18]

Although the Developer attempted during trial to portray the neighborhood opposition group as zealots who simply opposed all progress, the evidence showed that the group made efforts from very early on to resolve the dispute amicably while encouraging development and protecting the Buckhead's investment. For example, on February 11, 2008, Stop Ashby High Rise sent a letter to Buckhead's principals, Morgan and Kirton.[19] The letter indicates that the ideas it contains are "fully endorsed" by the group, which is "a joint committee of the Boulevard Oaks Civic Association and the Southampton Civic Club, Inc."[20] The letter proposes alternatives to the 23-story proposed high rise, and indicates a willingness to identify equity or debt investors who might support one of the alternative plans.[21] Buckhead rejected all proposals and declined to discuss them further.[22]

After rebuffing the neighborhood effort to discuss alternatives, Buckhead began the process of seeking the necessary approvals from the City of Houston for its proposed structure. Buckhead first submitted for City approval its traffic impact

---

[17] RR3 138:1-8; DX 50.
[18] CR 1200.
[19] DX 107.
[20] *Id.*
[21] *Id.*
[22] RR 11 141:14-15 R11 139:24-140:15.

analysis.[23]  The Buckhead traffic analysis showed that the project would generate a total of 184 peak hour automobile trips onto and off of Bissonnet—the so-called "trip count."[24]  The City initially approved the analysis Buckhead submitted, but it very soon after withdrew that approval.[25]  In denying the requested approval, the City determined that the project would create excessive interference and have an extraordinary impact on the public use of streets and public safety.[26]

In August, 2009, Buckhead submitted a revised application under protest.[27] The revised application reflected a reduced trip count of 120,[28] and the City approved the revised project.[29] Buckhead was not satisfied with this approval and continued to press for approval of its original application, despite the extraordinary impact that it would have on the neighborhood streets.[30] Buckhead appealed the City's denial of its original project to the City's appeal board and then the City Council, but both refused to set aside the decision.

---

[23] DX 45.

[24] DX 6.  Kirton described "trip generation" as "the number of trips from the project that is measured at the –either the a.m. peak or the p.m. peak time, the time that the surrounding street system is most heavily used typically: rush hour, morning traffic rush hour, evening traffic." RR11 40:22-41:4; *see also* CR 1200 n. 2.

[25] *Id.*; DX 46.

[26] RR3 147:13-149:23.

[27] CR 1200 & n. 2.

[28] *Id.*

[29] *Id.*

[30] *Id.*

On April 9, 2010, Buckhead brought suit in Harris County District Court against the City, seeking $40 million in alleged damages resulting from the City's refusal to approve its original application.[31] The City removed the case to federal court. The primary issue in the case was whether the City had authority by virtue of its so-called "driveway ordinance" to deny Buckhead's application.[32] The traffic impact of the proposed Ashby High Rise was *the* central focus of the case.

## B. The City and Buckhead Reach a Settlement.

After Buckhead's lawsuit had been pending for nearly two years, the City and Buckhead agreed to a settlement. The Settlement Agreement between Buckhead and the City of Houston, dated February 29, 2012, ("Settlement Agreement") includes a maximum trip count that the proposed project could not exceed.[33] The Settlement Agreement also provides that the project will: (1) be a 21-story residential or mixed-use residential and commercial development, with 10,075 square feet of restaurant use; (2) contain a pedestrian plaza will be constructed in front of the project; (3) not create in excess of certain maximum traffic counts; (4) include a green screen must be constructed on the south and east walls of the parking garage; (5) use lighting that is covered or directed away from neighboring residences; and (6) employ noise

---

[31] RR3 146:21-147:22.

[32] *Id.*

[33] RR3 157:3-9; PX 63; DX 9. The agreement actually specifies no more than 104 net p.m. peak hour trips, including trips for internal capture, or 115 net p.m. peak hour trips if credits are not taken. RR11 44:13-17. The availability of credits is discussed in greater detail *infra*.

7

mitigation procedures.[34]  For its part, the City agreed that it would approve permits for a project that met the Settlement Agreement criteria.[35]

## C. The Hunt investment.

By September 2011, Buckhead had entered a memorandum of understanding with an El Paso-based entity, Hunt SPV, L.L.C. ("Hunt"), for Hunt to become a majority owner of the entity that owned the property.  The agreement between Hunt and Buckhead closed in August of 2012, and Hunt became a 90 percent limited partner interest in the entity known as 1717 Bissonnet, L.L.C.[36]  Hunt SPV L.L.C., an El Paso-based real estate investment entity, owns a 90-percent limited partner interest in 1717 Bissonnet.  RR 3, 79:7-20.

The terms of Hunt's investment included a $3 million payment to Kirton and Morgan.[37]  Kirton and Morgan remained as the managing members and owners of Buckhead, the general partner of the managing member entity that controls 1717 Bissonnet, LLC.[38]  The documentation of the Hunt investment makes clear that the investment was made with full knowledge and understanding of the neighborhood opposition to the project.[39]

---

[34] DX 9.
[35] *Id.*
[36] RR3 79:2-11.
[37] RR 17 88:14-18.
[38] *See e.g.,* DX 104; RR3 78:24-79:11
[39] CR 904.

**D. The Construction Issues Committee and the Pre-Suit Effort to Obtain Information.**

During the negotiations of the Settlement Agreement, the City suggested the creation of a Construction Issues Committee ("CIC") that was to meet with the Developer to obtain information regarding the project as it moved forward. The City requested that the Developers agree to participate in the CIC, which was to consist of representatives of the Developer, the neighborhood residents, and the City to identify construction-related issues.[40] The Developer agreed to participate in the CIC to "show [its] good faith to work with the residents to minimize the amount of inconvenience during construction.[41] As will be discussed in greater detail below, Morgan testified that the CIC process turned out to be a bit of a sham.[42] In any event, representatives of the residents and the Developer participated in the CIC process, and in the early summer of 2012, conducted their first meeting.[43]

At the second meeting, on September 12, 2012, the Developers introduced Linbeck Construction Company as general contractor, and they distributed architectural renderings, but not plans.[44] A representative of the City "remind[ed] the developers that the site is limited to one restaurant pursuant to the Settlement

---

[40] RR3 189:20-25; 190:3-10.
[41] RR3 190:6-10.
[42] RR3 184:1-8.
[43] PX 62, 73, 79, 115, 177
[44] PX 115.

9

Agreement."[45]  The following meeting, on October 11, included a report from Morgan that "the developer had submitted applications for various permits to the [City], and those applications had been reviewed and returned by the [City] with comments."[46]  In other words, the CIC meetings indicated that the permitting process with the City remained substantially incomplete.  The City did not issue its approval for the foundation permit until January 17, 2013.[47]  The final building permit issued on March 27, 2013.[48]

Throughout this entire time period and the CIC process, the Developer did not provide access to detailed information about the project, such as plans and specifications. The residents were forced to seek that information elsewhere.  One resident, James Vick, filed open records requests with the City, which were denied.[49] The Developer likewise denied an oral request for construction documents, with the suggestion that the Developer would "be happy to reconsider [the request] once building permits for the project have been purchased from the City of Houston."[50] Both Morgan and Kirton testified that they refused to provide the residents with copies of the construction documents because they feared that doing so would trigger

---

[45] PX 177.
[46] *Id.*
[47] *Id.*
[48] CR 1103-1112.
[49] CR 1095-98.
[50] PX 115

a lawsuit.[51] Without the construction documents, the neighborhood residents could not assess how and to what extent the Ashby High Rise would impact their property rights.

On January 14, 2013, Penelope Loughhead filed an action under Rule 202 of the Texas Rules of Civil Procedure to obtain pre-suit discovery about the construction plans for the Ashby High Rise.[52] The trial court ordered production of certain construction information.[53]

### E. Plaintiffs file suit, and the suit proceeds quickly to trial.

On May 1, 2013, thirty-four days after the Developer received its building permit from the City of Houston, six plaintiffs filed suit seeking damages and a permanent injunction against the project.[54] The Harris County Administrative Judge transferred the suit to the 157th Court, because it had handled the Rule 202 action.[55] After an accelerated discovery period, trial commenced on November 19, 2013.

At trial, the Plaintiffs put on substantial evidence that the Ashby High Rise would be a nuisance if constructed. Earle Martin, a long-time resident, testified regarding how the construction and presence of the building feet away from his home would affect him.[56] He testified about the atmosphere of the neighborhood, the spirit

---

[51] RR3 242:17-243:2; RR11 178:7-13.
[52] CR 1201; *see also* RR3 242:19-243:2.
[53] *Id.*
[54] CR 9-19.
[55] CR 20.
[56] Testimony commences at RR3 250:20.

of community and the importance of home and neighborhood.[57] Martin testified regarding his concerns about traffic, and the dangers posed to small children.[58] He further testified about his fear of foundation damage,[59] the looming height of the building, and the shadows that it will cast.[60]

A number of other Plaintiffs testified similarly, including Jamie Flatt, Adrianna Botto Oliver, Richard Baraniuk, Laura Lee, Phillis Epps, Ken Miller, Michelle Jennings, Jeanne Meis, Surong Zhang, Steven Lin, Raja Gupta, Achim Bell, Ed Follis, Suzanne Powell, Normand Rund, and Scott Van Dyke.[61] Those plaintiffs testified regarding traffic, light, noise, shadow, foundation damages, and the general presence of an enormous High Rise in their residential neighborhood.

Plaintiffs also offered the testimony of certain expert witnesses regarding the interference with neighboring property rights that the Ashby High Rise would cause. Most strikingly, Roderick Ellman – a geotechnical expert – analyzed the soils of the Ashby High Rise site and the detailed plans for the massive structure and its foundation, which is designed to include over 600 auger cast piles[62] driven between

---

[57] *See, e.g.* RR3 259:14-260:16.
[58] RR3 262:1-266:4.
[59] RR3 276:19-24
[60] RR3 279:4-15.
[61] RR6 150:1-287:25; RR7 8:18-292:3; RR8 6:23-122:12.
[62] Ellman described an "auger cast pile" as "basically like a large corkscrew . . . that gets screwed into the ground. And once it gets to the bottom of wherever – the depth it needs to be, there is a hollow pipe down the center. Concrete is pumped out the tip. They reverse the auger and screw it out and replace the ground with concrete as they bring it up. Sometimes there is a reinforcement

12

80 and 100 feet into the soil.[63] Ellman's calculations and analysis showed that because of the size of the Ashby High Rise, its mass, the small property on which it will be situated, and the fact that it will sit as close as 10 feet from the adjacent properties, the Ashby High Rise will cause physical damage to the foundation and structures of a number of adjacent homes, including severe damage to certain homes, all as a result of the soil settlement that the structure will cause.

Specifically, Ellman testified that certain of the neighboring homes can expect to suffer "severe" to "very severe" damage from construction of the Ashby High Rise.[64] "Severe" to "very severe" damage means damage that will require extensive repair work, including replacing sections of walls, repairing distorted window frames, sloped floors, bearings, and beams. The damage can also give rise to leaking water and sewer lines and even complete disruption of those lines.[65] Ellman testified that other homes can expect to see moderate damage such as cracked brickwork, problems with doors and windows, and utility pipes fracturing.[66]

---

that's added after they concrete to the top. They will force in a reinforcing cage or some other type of device like that." CR6 30:9-19.

[63] *See* Ellman's testimony starting at *RR6* 26:9.

[64] RR6 66:22-15; *see also* PX 361; PX 363, which were admitted into evidence and appear on the index of exhibits supplied in the Reporter's Record, but, along with a number of other exhibits, are not reproduced in the Reporter's Record. Counsel for Plaintiffs has contacted the court reporter in an effort to rectify that problem, but in the meantime has provided copies of the two exhibits in the Appendix to this brief.

[65] *Id.*

[66] RR6 68:16-11.

As the trial developed, another theme began to take shape. In addition to evidence regarding the impact that the Ashby High Rise would have on the residents' property rights – including causing physical damage to a number of homes – substantial evidence was adduced that the Developer engaged in misleading tactics to obtain permits for the project and in seeking to win the trial.

**F. The evidence at trial demonstrated that the Developer acted in bad faith in its dealings with the City of Houston, the residents of the neighborhood, and the Court.**

*1. Buckhead's internal emails demonstrate that it never intended to comply with the Settlement Agreement.*

The evidence at trial demonstrated that Buckhead never intended to comply with the terms of the Settlement Agreement. Buckhead's internal emails reflect that it intended to flout at least two of the terms of the Settlement Agreement while fooling the City into believing that it was in compliance—the trip count requirement and the green screen requirement.

*a. Buckhead artificially manipulated the trip count to make it look lower.*

The evidence conclusively showed that in preparing submissions to the City, Buckhead deceived the City into believing that the trip count would be compliant with the Settlement Agreement by misrepresenting the number of restaurants planned for its project. The number and size of restaurants is critically important to the trip count because each restaurant generates its own unique trips, and traffic engineers count those trips in a particular way. The trip-count calculation for

14

restaurants allows for a deduction from the count for a certain percentage of "pass-by trips," [67] but to qualify for a "pass-by" deduction, a restaurant must be more than 6500 square feet.[68] Multiple restaurants create a higher trip count. In other words, the number and size of the restaurants that the Ashby High Rise will contain is crucial to determining the trip-count.

Buckhead well understood the import of the number and size of restaurants to the trip count and decided to deceive the City about the traffic impact of the project during the permitting process. In an email exchange between Matthew Morgan and his engineer regarding a submission to the City, Morgan stated:

> Ben,
>
> The idea is to telegraph as FEW restaurants as possible (i.e. no more than one). The settlement with the City limits us based on traffic trips and our trip generation calculation assumes we'll operate a single 10K SF restaurant. Now, a 10K SF restaurant is not practical or feasible, so we've always assumed we'd configure the shell space into 2 or maybe even 3 separate food service operations of different sorts. However, our traffic engineer has suggested that if we call it more than a single operation, the way the traffic math works might push us over the limit . . . But we still want to provision both spaces for the possibility of two kitchens to maintain as much flexibility as possible without suggesting to the City (and especially the lawyers all working for the NIMBY opposition group) that we're somehow exceeding the limit placed on us by the settlement terms. [69]

---

[67] A "pass-by" trip is the term a traffic engineer gives to a stop on the way to another destination. The Developer's traffic expert testified as an example that he sometimes stops to eat at the Raven restaurant on his way back from the Museum of Fine Arts in Houston. R11 242:18-243:4. Because his car would have been on the road anyway, the trip does not add to the overall count, and it qualifies for a deduction from a traffic count relating to Raven as a "pass-by" trip. *Id.*

[68] RR 12:30:3-14.

[69] PX 63 (emphasis original); s*ee also* R11 171:3-12; R11 172:22-173:9.

15

Morgan openly acknowledged that a single restaurant was neither practical nor feasible, and Buckhead had no intention of limiting the project to a single restaurant. But he asked his engineer to submit information to the City that misrepresented Buckhead's plan. In his testimony, Kirton confirmed that Morgan's purpose was to cause the City to believe that the Ashby High Rise when constructed would have only one restaurant, although such a configuration was not intended and was neither practical nor feasible.[70]

The misrepresentation regarding the number of restaurants went beyond just submissions to the City. The Developer's subterfuge extended to misrepresentations to its own traffic engineer, who was told there would be a single restaurant.[71] The traffic engineer testified that the data regarding the restaurant count was crucial to his analysis.[72] When he was shown the construction documents that revealed an intent to construct 2 restaurants, he agreed that it would have made a difference in the trip count and would not comply with the Settlement Agreement.[73]

*b. Buckhead planned to circumvent the green screen requirement.*

The evidence revealed a similar effort to escape the terms of the Settlement Agreement relating to the so-called "green screen." The Settlement Agreement

---

[70] RR 11 173:2-22.
[71] RR12 32:5-25.
[72] RR12 33:1-13
[73] RR12 36:8-19.

requires a green screen, or a vegetative covering like fig ivy on the east and south sides of the parking garage.[74] Part of the purpose of the green screen is to mitigate the effect of an above-ground parking garage on the neighboring property, and in particular the car lights in the garage.[75]

Buckhead has no intention of providing a green screen as contemplated in the Settlement Agreement. To the contrary, Kirton testified that the Developer is considering a screen that covered only the surfaces of the walls, and not the openings in the garage because that was in technical compliance with the wording of the Settlement Agreement.[76] For his part, Morgan was proud that he had included language in the Settlement Agreement to allow an arguably technical compliance without fulfilling the purpose of light mitigation.[77] And in the end, the current construction plan includes no green screen at all.[78]

2. *Buckhead's internal emails demonstrated a general willingness to submit false documents to the City.*

In addition to the misrepresentations to mask their intent to violate the terms of the Settlement Agreement, the evidence included internal emails produced by the Developer that demonstrated a willingness to be submit false documents to the City to obtain foundation permits. Plaintiffs' exhibit 64 is an email from Matthew

---

[74] RR11 49:18-25.
[75] RR 11 148:1-5.
[76] RR 11 148:6-24.
[77] PX 77; R11 155:19-159:24.
[78] PX 78; R11 152:18-23; PX 138; R11 162:23-163:25

17

Morgan to Kevin Kirton, regarding the resubmission of the foundation permitting application to the City. The email states in relevant part:

> this submission must nevertheless appear credible and convincing to the City in order to serve its purpose (i.e. we may acknowledge that this foundation design will not be built, but the City folks must be led to believe that it will be). I think we've all discussed this…"[79]

The Developer intentionally set out to mislead the City regarding the foundation design that it intended to use, and it did so in accordance with internal discussions. Plaintiffs' exhibit 65 is another email that reinforces the same theme, in which Morgan states, vis-à-vis the permitting process for the foundation design that "we'll never build the design that's going to be approved."[80]

Morgan conceded in his testimony that it would be completely inappropriate to file a permit for a foundation design that he knew he would not build, and that it would be inappropriate to try to mislead the City, particularly after the settlement process.[81] Yet, that is precisely what the Developer did.

*3. Morgan testified that he did not keep his promises.*

As mentioned above, Morgan did not believe that the CIC process was useful.[82] He insisted that the representations made by the Developer to the neighborhood residents during those meetings were not "promises."[83] Morgan

---

[79] PX 64.
[80] PX 65.
[81] RR3 183:5-14.
[82] RR3 184:1-11.
[83] RR3 184:12-21.

18

testified that he did not feel bound by the promises made during CIC meetings and that he is not able to keep every promise he makes.[84]  He testified that no matter what the Developer said at the CIC meetings, it would be able to make changes, and that the Developer would make whatever changes it deemed necessary and appropriate.[85]  The Developer did not view a series of promises relating to construction activities, including limited work hours, as binding commitments.[86]

> 4. *The Developer engaged in sharp trial practices, including introducing misleading testimony and last-minute production of highly misleading evidence.*

The Developer's efforts to mislead and to disguise the truth about the Ashby High Rise also infected the trial proceedings.  Among the most contested issues at trial was the extent to which the construction of the Ashby High Rise would cause physical damage to neighboring homes.  Plaintiffs submitted detailed expert analysis and calculations from a well-regarded geotechnical expert –Ellman – showing that the Ashby High Rise, if constructed as planned, would cause substantial damage to a number of the neighboring homes.  Because the property is so small, and the footprint of the Ashby High Rise will place the massive structure and its foundation within 10 feet of the adjacent properties, the weight of the Ashby High Rise will cause the soil to compress (as all buildings do), which will radiate out to an extent

---

[84] RR3 185:15-24; 194:24-195:7.
[85] RR3 190:18-25.
[86] RR3 194:9-18.

19

(as all compression does) and will damage the immediately adjacent single family homes that are only a few feet away.

To address this issue, the Developer relied in part on its geotechnical expert for the Ashby High Rise project Woodward Lee Vogt.[87] Vogt testified that he disagreed with Ellman based on his experience, but admitted that in his work on the project over the many years leading up to trial he never conducted any soil analysis (which Ellman conducted) to determine if soil compression will be a problem in light of how uniquely close the massive Ashby High Rise and its foundation will be to adjacent single family homes.

One of the primary factors for determining the extent that a construction project will alter or destabilize the surrounding soil is the soil's "recompression index." A higher index suggests a greater destabilizing effect because it means that the soil will compress more under the weight of a given structure, and in turn that compression will radiate out further from the structure before it dissipates. Vogt's original trial testimony was unequivocal that the recompression index of the soil was 0.02.[88] Vogt testified that he relied on his experience instead of data to conclude that only a negligible amount of settlement would occur as a result of the placing of foundational auger cast piles.[89] In fact, Vogt testified that he estimated that the

---

[87] RR10 103:4-19
[88] RR10 126:4-10.
[89] RR10 131:5-14.

settlement would be less than an inch without conducting any calculations, performing any modeling or using any work papers. The only excuse he offered for not doing any analysis to consider the impact on the neighboring homes is that he did not know his work would be used in litigation.[90]

It is not disputed that Vogt conducted no deep-hole borings to test the soil in the years that this project was being designed, even though he acknowledged that deep-hole borings are necessary to calculate the actual recompression index of a particular soil. Without such a deep-hole boring, Ellman relied on studies that aggregated compression index statistics for the area and soils in the same geological area as the Ashby High Rise, to estimate the recompression index for this site. Vogt did nothing and just relied on his "experience."

The first time the Developer conducted a deep hole boring to test the actual recompression index was on November 12, 2013, five days before trial commenced, when the Developer hired a third-party named Tolunay-Wong to conduct such a test.[91] Although the borings were conducted on November 12, at the request of the Developer, no information or documents relating to this important test were provided to Plaintiffs at the time. Plaintiffs were not even told that a boring was being done.

---

[90] *Id.*
[91] RR10:7:17-25.

Instead, the Developer waited until late at night, in the middle of trial, to produce certain, cherry-picked documents that purported to reflect the results of the borings done by Tolunay-Wong on November 12, 2013 to determine the recompression index. In fact, those cherry-picked documents were provided to counsel for Plaintiffs on December 5, at 10:30 p.m. the night before Vogt was to take the stand.[92] The limited documents Plaintiffs received at the eleventh hour reflected a handwritten calculation of a recompression index of 0.026, which was consistent with Vogt's opinion.[93] When the trial court learned of this last-minute production, he expressed substantial frustration.[94] And when counsel for Plaintiffs suggested that his "guess" was that the sample actually confirmed Plaintiffs' expert's position that the recompression index was close to 0.06, counsel for the Developer indicated that it did not.[95]

It turned out that in this eleventh-hour production, the Developer withheld from Plaintiffs substantial portions of the results of the borings. Vogt received the entire report from Tolunay-Wong, but the Developer did not voluntarily provide that complete report to Plaintiffs.[96] Once Plaintiffs—after substantial effort including a subpoena—were able to obtain the complete results, they discovered that the results

---

[92] *Id.*; *see also* RR15:28-24;29:15; 30:1-25; PX 385; DX 143.
[93] RR15 30:15-20; PX 385.
[94] RR10:1-9.
[95] RR12 12:12-16
[96] RR15 33:10-34:3.

reflected a recompression index of 0.06, **which was consistent with the opinions of Plaintiffs' expert and proved that Vogt's guess that the recompression index was 0.02 was wrong**.[97]  As a result of the Developer's late-produced and woefully incomplete production of evidence, and its expert's efforts to conceal the truth, the trial court was forced to extend the trial schedule to allow for additional discovery.[98]

Kevin Kirton's testimony was similarly troubling.  In response to his own counsel's question, Kirton testified that he had never received a written offer for purchase of the property from anyone in the neighborhood that he recognized or believed was "real."[99] This testimony was highly relevant to whether the Developer had an opportunity to withdraw from the plan at minimal cost, which the Developer vehemently denied.

The truth was that the Developer had received a written letter of intent, dated August 19, 2013, offering to purchase the property at 1717 Bissonnet for $10.5 million.[100]  The offer sets forth a full timeline and a suggestion of proper escrow amounts.[101]  The offer was hand – delivered at an in – person meeting by and is signed by Adam Lambert – a neighborhood resident who *testified at trial in support*

---

[97] RR15 36:11-19; 37:19-22; 40:25-41:3; 42:25-43:11.
[98] RR13:8-21.
[99] RR11 195:11-196:3.
[100] CR 906-08.
[101] *Id.*

23

*of the Developer.*[102] The Developer did not even disclose the existence of this offer until after the trial had ended, in post-verdict discovery.[103] In his post-verdict deposition, Kirton finally conceded that he "guessed" his answer at trial about the absence of an offer "was inaccurate."[104]

### G. The jury finds unanimously that the Ashby High Rise will be a nuisance if built.

At the close of the evidence, the trial court submitted a jury charge and verdict form that closely mirrored the nuisance charge contained in the Texas Pattern Jury Charge. The jury returned a unanimous verdict, finding that the Ashby High Rise would constitute a nuisance as to 20 of the 30 Plaintiff households.[105] After the verdict, the jury was discharged, and the trial court set an evidentiary hearing for evidence and testimony relating to the Plaintiffs' request for injunctive relief.[106] After both sides had rested, the Court heard closing arguments.[107] On May 1, 2014, the trial court rendered a written opinion and order denying the requested permanent injunction. The court also denied Plaintiffs damages for loss of use and enjoyment and asked the parties to prepare a judgment awarding Plaintiffs damages for loss of market value as awarded by the jury.

---

[102] RR17 44:23-7; 47:9-16.
[103] RR17 47:17-20.
[104] RR17 49:21-22.
[105] CR 730-740.
[106] RR17.
[107] RR18.

**H. In spite of the jury's unanimous finding of nuisance, and in spite of the evidence of the Developer's willingness to mislead the City and the neighborhood, the trial court denied Plaintiffs' request for permanent injunction.**

In its opinion rejecting Plaintiffs' request for injunctive relief, the trial court started by rejecting the Developer's request for a JNOV, affirming the jury's finding of nuisance. The court then went on to disregard the significance of that jury finding – that Plaintiffs' property rights are substantially threatened. In refusing to issue a permanent injunction, the trial court also ignored the substantial evidence relating to the Developer's bad faith and misleading actions. The trial court instead overstated the problems attendant to tailoring injunctive relief, the harm that an injunction would cause the Developer, the Plaintiffs' alleged delay in filing suit, and even suggested in the absence of any supporting evidence that the conduct of unknown anonymous protesters should weigh against the granting of an injunction. Because Plaintiffs believe that the trial court erred in refusing the injunction, they have brought this appeal.

## SUMMARY OF THE ARGUMENT

The trial court abused its discretion in denying Plaintiffs' request for a permanent injunction, in light of the jury's unanimous finding of nuisance. The trial court's error was the cumulative result of several significant legal missteps. First, the trial court erroneously penalized Plaintiffs for failing to adduce evidence of what kind of structure would not constitute a nuisance, when Plaintiffs only burden was

25

to demonstrate nuisance with respect to the proposed High Rise. Second, the trial court erred in balancing the equities, ignoring substantial equitable reasons favoring injunction and wrongly suggesting that Plaintiffs delayed in bringing suit. The court also erred in evaluating the possible "chilling" effect of an injunction by failing to weigh it against the finding that the Ashby High Rise would constitute a nuisance. The Court further erred in holding that Plaintiffs had an adequate remedy at law when the injury they will suffer is permanent injury and physical damage to their homes. Finally, the trial court erroneously suggested that it was appropriate to penalize these Plaintiffs for the actions of anonymous threats and other actions taken by unknown actors.

## ARGUMENT

Texas law provides that a permanent injunction is an appropriate remedy to protect against a private nuisance. *See, e.g., Freedman v. Briarcroft Property Owners, Inc.*, 776 S.W.2d 212, 214 (Tex. App.—Houston [14th Dist.] 1989, writ denied). Where, as here, a jury has found a nuisance, an order of permanent injunctive relief is plainly available. *Spiller v. Lyons*, 737 S.W.2d 29 (Tex. App.—Houston [14th Dist.] 1987, no writ). Indeed, in *Spiller*, this Court reinstated a permanent injunction based on nuisance after the trial court had nullified its injunction order by rendering judgment notwithstanding the verdict. *Id.* at 29. This Court held that the evidence that increased traffic would cause a danger to children

26

in an otherwise quiet and family-oriented neighborhood was sufficient to support an injunction, and ordered that it be reinstated. *Id.*; *see also Assembly of God Church of Tahoka v. Bradley*, 196 S.W.2d 696, 697 (Tex. Civ. App.—Amarillo 1946, no writ)(affirming the permanent injunction against the construction of a church building based on a finding of nuisance).

The jury finding that the Ashby High Rise will be a nuisance is a sufficient basis by itself to enter the permanent injunction. The nuisance will constitute injury to real property, making the injury irreparable in the eyes of the law. TEX. CIV. PRAC. & REM. CODE § 65.011(5); *see also Assembly of God Church*, 196 S.W.2d at 697 ("the judgment [entering an injunction] should be affirmed if the evidence supports the jury's finding that the building, when constructed, would be a nuisance").

Although a trial court has discretion in determining whether to issue an injunction, that discretion is not unlimited, and the trial court has no discretion in determining the legal underpinnings for its ruling. *See, e.g., In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 483 (Tex. 2001) (a trial court has no discretion to determine what the law is). The trial court committed legal errors which led it to abuse its discretion in refusing to enter the injunction.

27

**A. The trial court erred in balancing the equities.**

In considering Plaintiffs' request for a permanent injunction the trial court was required to balance the equities. If the equities weigh in favor of an injunction, then the trial court should enjoin the nuisance.

The trial court erred in balancing the equities in this case in a number of ways. First, the trial court imposed on Plaintiffs a burden beyond that which Texas law requires. Second, the trial court ignored the overwhelming evidence of Defendants' misconduct, and improperly credited evidence from Defendants that, under Texas law, is not competent evidence.

### 1. The trial court improperly penalized Plaintiffs for failing to prove what would not constitute a nuisance.

The trial court declined to enter an injunction in part because Plaintiffs failed to provide evidence on which the jury could base a finding that another, different project might not constitute a nuisance. The trial court apparently believed that Plaintiffs should have shouldered the burden of designing a building that the Developer could build without harming Plaintiffs.[108] The trial court's ruling was a legal error, and it placed an impossible and unfair burden on Plaintiffs while rewarding the Developer for its failures at trial.

---

[108] CR 1207-09.

28

The Developer, and not Plaintiffs, had the burden to present alternatives or modifications of its plans to the jury if it hoped to obtain a finding from the jury that a particular option was not a nuisance. In *Pool v. River Bend Ranch, LLC,*346 S.W.3d 853, 857 (Tex. App.—Tyler 2011, pet. denied), the plaintiff homeowners obtained a nuisance finding and secured a permanent injunction against the operation of an all-terrain vehicle park on defendant's ranch. *Id.* The defendants had been operating a commercial ATV park on their property for approximately 8 years, and the operation had expanded until the lawsuit was filed. *Id.* at 855. At trial, both sides adduced evidence about the effect on the homeowners of the operations of the ATV park. *Id.* The trial court found that the ATV park was a nuisance, and it entered a permanent injunction preventing the defendants from operating a commercial ATV park on the property. *Id.*

On appeal, the defendants complained that the injunction was overly broad because "it enjoined them from operating any commercial ATV events." *Id.* Defendants urged that the injunction should have been tailored to allow operations to return to reduced levels such as those that existed before the expansion. *Id.* at 859. The Tyler Court of Appeals rejected this position:

> Based on our review of the record, there was no evidence before the court that established that these commercial ATV events were any less a nuisance in 2007 than they were in 2003. Further, there was no evidence in the record that demonstrated what number of ATVs or motorcycles in operation would not constitute a nuisance to the community. Without this evidence, there was no basis upon which the

29

> trial court could craft an injunction that eliminated the nuisance caused by the excessive noise, short of prohibiting the commercial ATV park on Pool Ranch in its entirety.

*Id.* at 860. If defendants wanted a finding of what would not be a nuisance, it was their burden to offer the evidence necessary to show what level of ATV operations would not constitute a nuisance.

The trial record in *Freedman*, 776 S.W.2d at 212 is also instructive. In that case, the defendant offered two proposed modifications to their plans in an effort to avoid a nuisance finding, a barrier and armed security guards. *Id.* at 217. The jury found that even with the proposed modifications, the parking lot would constitute a nuisance. *Id.*

The injunction order in *Champion Forest Baptist Church v. Rowe,* 1987 WL 5188 (Tex. App. – Houston [1st Dist.] Jan. 8, 1987), provides guidance on the proper approach. In *Champion Forest*, the First Court of Appeals affirmed the trial court's entry of a permanent injunction against the defendant church's construction of a parking garage. The injunction enjoined the defendant "from constructing the proposed parking garage at the proposed site." *See* Copy of Order granting Permanent Injunction, CR 1053-57. After the injunction was entered, the church significantly redesigned the garage to remedy the aspects that caused the nuisance, increasing the setbacks and changing the traffic flow. *See Rowe v. Moore*, 756 S.W.2d 117, 118 (Tex. App.—Houston [1st Dist.] 1988, no writ). The plaintiffs in

*Champion Forest* nonetheless claimed that construction of the redesigned garage would violate the injunction and moved for contempt. *Id.* The trial court denied the contempt motion and the court of appeals affirmed. The *Champion Forest* case provides an excellent model for appropriate injunctive relief against the construction of a prospective nuisance, but the trial court erroneously rejected the model.

These cases reflect the only sensible approach to the question. Plaintiffs in this case (or any other nuisance case) are not required to provide evidence of a hypothetical project that would *not* be a nuisance. Plaintiffs have the burden of showing that the actual project that a defendant intends to construct will create a nuisance. Once they have sustained that burden, they are entitled to relief. To impose further burden on them is outside the scope of tort law.

A nuisance plaintiff could offer countless alternative proposals for a particular property—anything from a park to a Walgreen's—without supplying an alternative that the defendant would actually be willing to build. Such evidence would be a side-show and a complete waste of the court's time. The trial court's decision to shift the burden to the Plaintiffs to demonstrate what would not constitute a nuisance was error that led to its abuse of discretion.

31

**2.     The trial court's determination that an injunction would harm the Developer is not supported by the evidence.**

The trial court next concluded that an injunction would cause "considerable hardship" to the Developer because "[w]hile the defendant could sell the Property and recoup some of its losses, in no way could defendant come out whole. Defendant has considerable sunk costs in design and engineering fees. This effort and work cannot simply be picked up and moved to a new location."[109]  That conclusion is not supported by the evidence.

The Developer offered no competent evidence that it would suffer "considerable hardship" if its present project were enjoined, or that it would not be able to recoup its investment if it decided to sell the property as a result. It is just as likely that the Developer could come out ahead, not behind, if it built the Ashby High Rise at a more appropriate location, on an adequately sized parcel of land, with sufficient surrounding infrastructure, and without causing foundation damage, traffic problems, and privacy invasions that resulted in the jury finding this project to be a nuisance. The Court's statement that "in no way could defendant come out whole" is speculation. The evidence does not support such a conclusion, and the Court erred in including that determination as part of its balancing of the equities.

---

[109] CR 1210.

32

**3.      The trial court's determination that an injunction would cause harm to the community is not supported by the evidence.**

The trial court stated that "[i]f an injunction is granted, there is no question but that it will have a chilling effect on other development in Houston."[110] That determination, too, is speculation that is not supported by the evidence. The Developer did not offer any competent evidence of the impact that an injunction would have on development in Houston. To the contrary, the evidence was uncontroverted that the City now has a "buffering ordinance" that specifically requires a certain amount of setback from adjacent properties, and that the Ashby High Rise could not be permitted or constructed under the terms of that ordinance.[111]

The evidence presented to the jury instead showed that the Ashby High Rise is a unique project with unique circumstances, and for that reason is unlikely to impact other development in Houston. The evidence demonstrated that the Developer mislead the City in the permitting process with respect to the traffic and green screen requirements of the Settlement Agreement.[112] Documentary evidence showed that the Developer was willing to submit plans that it has no intention of

[110] CR 1211.

[111] RR9 6:15-19:16; PX 302;303  The trial court did not permit Plaintiffs to introduce evidence of the "buffering ordinance" to the jury during trial, even though it permitted the developer to present testimony from an expert regarding Houston's history of zoning and ordinances. Nonetheless, the evidence of the buffering ordinance was part of the record that the trial court had before it because Plaintiffs made a proffer on the record and outside the presence of the jury.

[112]  PX 63;  R11 171:3-12; R11 172:22-173:9; RR 11 148:6-24; PX 77; R11 155:19-159:24.  .

building just to get a permit issued.[113]  Documents and testimony from Defendants'

geotechnical expert revealed that the Developer never conducted the tests necessary

to assess whether the Ashby High Rise would cause physical damage to adjacent

homes before trial, and when the Developer finally did conduct those tests during

trial, the Developer and their expert tried to misrepresent that the tests supported

their position while concealing the actual results.[114]

The only possible "chilling effect" supported by the evidence, then, is that an

injunction might deter developers from misleading the City to get permits issued,

and may cause developers to consider whether they will physically damage

neighboring structures when they are designing their project.  Deterrence of future

tortious conduct is among the primary purposes of tort law.  *See Roberts v.

Williamson*, 111 S.W.3d 113, 118 (Tex. 2003) ("The fundamental purposes of our

tort system are to deter wrongful conduct, shift losses to responsible parties, and

fairly compensate deserving victims).  To the extent that an injunction would serve

to deter the wrongful conduct and design flaws that infect the Ashby High Rise

project, that would be a benefit to the community, not harm.

The trial court also stated that "the Project will provide benefits to the city as

a whole"[115] as part of its determination that an injunction would harm the

---

[113] PX 64, PX 65
[114]  RR15 33:10-34:3. RR15 36:11-19; 37:19-22; 40:25-41:3; 42:25-43:11.
[115] CR 1212.

community. That, too, is speculation and is not supported by the evidence. The Developer did not offer any evidence that the Ashby High Rise as currently proposed will provide any more benefit to the City than would be provided by a different project on the current site or by building the Ashby High Rise at another location. Without such a comparison of alternatives, it cannot be said that an enjoining the construction of the Ashby High Rise as proposed will deprive the City of any benefit.

4. **The trial court ignored the evidence that the Developer misled the City to obtain permits for the project.**

The trial court weighed the fact that the City of Houston entered into Settlement Agreement with the Developer and issued permits for the Ashby High Rise as support for denying the requested injunction. In doing so, the court ignored the substantial evidence that the Developer intended to mislead the City regarding the number of restaurants, the green screen, and it foundation plans. The trial court similarly ignored the Developer's misleading testimony regarding offers it received to purchase the site, as well as the Developer's late production of misleading evidence that led to an unnecessary extension of the trial. The actions of the Developer leading up to and during trial demonstrate its willingness to submit false applications and adduce false evidence in support of its cause.

35

**5.** **The trial court's determination that Plaintiffs delayed in bringing this lawsuit is not supported by the evidence.**

Instead of giving the appropriate weight to this overwhelming evidence of dishonest behavior, which was fully before him, the trial court found that the Plaintiffs unnecessarily delayed in filing suit, causing the Developer harm.[116] This finding is unsupported by the record. The record demonstrates that Plaintiffs filed suit shortly after the Developer received its permit. Had Plaintiffs filed any sooner, the Developer undoubtedly would have argued that the suit was premature.

Furthermore, the record conclusively establishes that both Morgan and Kirton fully anticipated a lawsuit, and intentionally withheld their construction plans from Plaintiffs because of their fear of a lawsuit.[117] Morgan and Kirton believed that Plaintiffs would sue if they obtained the construction plans and could assess the substantial interference the Ashby High Rise would cause, so Morgan and Kirton withheld construction plans. As soon as Plaintiffs obtained the construction plans, they investigated the impacts that the project would have on the neighborhood, and, based on the results of that investigation, they immediately filed suit. For example, the neighborhood residents had no way to analyze whether the Ashby High Rise would cause foundation damage to neighboring homes without the construction plans that were withheld from them. The Texas Rules of Civil Procedure require a

---

[116] CR 1210.
[117] RR3 242:17-243:2; RR11 178:7-13.

plaintiff to investigate and have a good faith basis for his or her claims prior to filing a lawsuit. *See, e.g.,* TEX. R. CIV. P. 13. The trial nonetheless court found that the Plaintiffs' delayed in filing suit—even though any "delay" was intentionally caused by Morgan and Kirton's own recalcitrance—and weighed that against Plaintiffs in evaluating injunctive relief.[118]

Compounding this error in weighing the evidence, the trial court failed to consider that the Developers had multiple opportunities to exit without incurring losses. The evidence showed that in February 2008, a few months after the public release of the Developer's plan, members of the surrounding community made an offer that would have made Developers whole.[119] The Developers rejected this offer and doubled-down on the high rise concept, making all subsequent investment at the Developer's own risk.

The Hunt entity also chose to invest in the project fully informed of the widespread opposition to the High Rise and the associated risks of developing a project that the neighboring homeowners viewed as an invasion of their property rights. The Hunt entity even signed a litigation schedule, acknowledging this risk.[120] Under these circumstances, the notion that Plaintiffs' purported "delay" caused any undue harm to the Developer is unfounded.

---

[118] CR 1210.
[119] DX 107.
[120] CR 904.

37

**B. The trial court erred in holding that Plaintiffs have an adequate remedy at law.**

In holding that the Plaintiffs have an adequate remedy at law, the trial court ignored the Texas Civil Practice and Remedies Code and decades of Texas case law indicating that a threatened harm to real property, and in particular to a person's home, is irreparable as a matter of law. TEX. CIV. PRAC. & REM. CODE § 65.011 (5); *Stein v. Killough*, 53 S.W.3d 36, 40 (Tex. App.—San Antonio 2001, no pet.) (affirming a permanent injunction to prevent harm that would reduce the market value of the litigant's real property).

Some of the most compelling evidence at trial showed that the Ashby High Rise, if built, will cause a substantial amount of physical damage to a number of adjacent homes over an extended period of time. That damage will require extensive repair work, including replacing sections of walls, repairing distorted window frames, sloped floors, bearings and beams, and service pipes.[121] When a person's home is involved, damages are not an adequate remedy for such damage.

Given that the trial court has held that the Ashby High Rise has already reduced the market value of Plaintiffs' property, and the record testimony of all the ways both tangible and intangible that the presence of the Ashby High Rise will

---

[121]PX361.

38

interfere with Plaintiffs' use and enjoyment of their homes, the trial court erred in holding that the Plaintiffs injuries are compensable at law.

**C. The trial court erred in penalizing Plaintiffs for the actions of anonymous protesters.**

The trial court erroneously considered the behavior of anonymous protestors against the Ashby High Rise in declining to issue an injunction against its construction. The suggestion that the evidence showed that any one of the Plaintiffs themselves engaged in a "threat" against the developers is unsupported by the record evidence. And the simple fact that Plaintiffs and others were vehemently opposed to the project demonstrates only that the damage that the Ashby High Rise will cause them is substantial and very important to them. The trial court's finding that the Plaintiffs are not entitled to equitable relief because of their conduct is not supported on this record.

## CONCLUSION AND PRAYER

The trial court committed several legal errors causing it to abuse its discretion in refusing to issue the requested injunction. Plaintiffs respectfully request that this Court reverse the trial court's denial of injunctive relief and issue a judgment permanently enjoining the Ashby High Rise.

Respectfully submitted,

**REYNOLDS FRIZZELL LLP**

By: */s/ Jean C. Frizzell*

Jean C. Frizzell
State Bar No: 07484650
Jeremy Doyle
State Bar No: 24012553
Solace K. Southwick
State Bar No. 11522150
James A. Schuelke
State Bar No: 24075037
1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Telephone: (713) 485-7200
Facsimile: (713) 485-7250
jfrizzell@reynoldsfrizzell.com
jdoyle@reynoldsfrizzell.com
ssouthwick@reynoldsfrizzell.com
jschuelke@reynoldsfrizzell.com

**COUNSEL FOR PLAINTIFFS/
APPELLEES/CROSS-APPELLANTS**


## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this Brief contains 8977 words, excluding the words not included in the word count pursuant to Texas Rule of Appellate Procedure 9.4(i)(1). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

*/s/ Solace Kirkland Southwick*
Solace Kirkland Southwick

## CERTIFICATE OF SERVICE

As required by Texas Rules of Appellate Procedure 6.3 and 9.5, I certify that I have served this document on all parties on April 8, 2015 via e-filing and/or e-mail.

H. Fred Cook
Brandon Hedblom
Wilson, Cribbs & Goren, P.C.
2500 Fannin
Houston, Texas 77002

Ramon G. Viada III
17 Swallow Tail Court
The Woodlands, Texas 77381

*/s/ Jean C. Frizzell*
Jean C. Frizzell

NO. 2013-26155

| | | |
|---|---|---|
| PENELOPE LOUGHHEAD, HOWARD EPPS, PHYLLIS GRIFFIN EPPS, EARLE MARTIN, JEANNE MEIS, STEPHEN GLYNN ROBERTS, RICHARD G. BARANIUK, MARY SARAH BARANIUK, JAMES D. CLIFTON, ALLISON KELLY CLIFTON, JAMIE FLATT, MARTHA GARIEPY, RALPH KEN MILLER, JR., LESLIE M. MILLER, PETER STUART OLIVER, ADRIANA BOTTO OLIVER, NORMAN A. RUND, SUANNAH L. RUND, MARY THERESA VAN DYKE, ACHIM BELL, DIANA BELL, KIMBERLEY BELL, MARC M. FAVRE-MASSARTIC, ED B. FOLLIS, LAM NGUYEN, KATHERINE HOANG, LUONG NGUYEN, SUZANNE POWELL, KENNETH D. REUSSER, XANTHI I. COUROUCLI, FRANK T. STOKES, JEANETTE P. STOKES, MICHAEL H. CLARK, DINZEL R. GRAVES, MICHELLE JENNINGS, STEVEN K. LIN, SARAH C. MORIAN, YI-WEN MICHELLE PU, MICHAEL TETZLAFF, SURONG ZHANG, YIN ZHANG, RAJA GUPTA, DICO HASSID, LAURA R. LEE, DONALD VERPLANCKEN | § § § § § § § § § § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF |
| | | HARRIS COUNTY, TEXAS |
| | | 157th JUDICIAL DISTRICT |
| *Plaintiffs,* | § § | *Jury Demanded* |
| v. | § § § | |
| 1717 BISSONNET, LLC. | § § § | |
| *Defendant* | § | |

## FINAL JUDGMENT

On the 19th day of November 2013, the above-entitled and numbered cause was called for trial. The parties announced ready through their attorneys of record. The Court empaneled a jury of twelve, and the case proceeded to trial. At the conclusion of the evidence, the jury reached a unanimous verdict on December 17, 2013. The jury found, as to 29 plaintiffs or 20 households, that



RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging



1271

the proposed high rise development at 1717 Bissonnet will constitute a nuisance if built. The jury awarded damages to those plaintiffs. A true and correct copy of the signed verdict form is attached as Exhibit 1 to this Final Judgment.

Following the verdict, the Defendant filed a motion for entry of judgment, for judgment NOV and to disregard jury findings. The Plaintiffs filed an application for permanent injunction. On May 1, 2014, this Court signed a memorandum opinion and order ruling on such motions and directed the parties to prepare a final judgment consistent with the memorandum opinion. Accordingly, it is

ORDERED, ADJUDGED, and FINALLY DECREED that each of the following Plaintiffs (hereinafter collectively. the "Prevailing Plaintiffs") have and recover from and against the Defendant the sum set forth beside the name of each such Plaintiff or Plaintiffs, as found by the jury for loss of market value to their properties:

1. Luong Nguyen – $88,050.00.

2. Lam Nguyen and Katherine Hoang, jointly – $25,932.25.

3. Jamie Flatt – $84.888.00.

4. Penelope Loughhead – $90,288.00.

5. Donald Verplancken – $72.252.00.

6. Norman and Suannah Rund, jointly – $96,630.00

7. Achim and Diana Bell, jointly – $80,471.04.

8. Jeanne Meis – $79,891.20.

9. Mary Van Dyke – $88,680 60.

10. Ralph and Leslie Miller, jointly – $94,528.80.

11. Yin and Surong Zhang, jointly – $102,483.00.

1272

12. Martha Gariepy – $88,065.00.

13 Stephen Roberts – $47,693 50.

14. Suzanne Powell – $20,191.68.

15. Michelle Jennings and Michael Tetzlaff, jointly – $17,613.00.

16. James and Allison Clifton, jointly – $28,850.30

17. Kimberley Bell – $24,097.50.

18. Richard and Mary Baraniuk. jointly – $21,596.04.

19. Kenneth Reusser and Xanthi Couroucli, jointly – $33,636.69.

20. Earle Martin – $36,923.58.

This judgment is without prejudice to the Prevailing Plaintiffs' right to seek and recover damages for the loss of use and enjoyment of their properties resulting from the nuisance when such damages become ripe for judicial determination. It is further

ORDERED. ADJUDGED, and FINALLY DECREED that each of the twenty damage awards set forth above shall bear interest at the rate of 5%. compounded annually, until such judgment has been satisfied. It is further

ORDERED, ADJUDGED, and FINALLY DECREED that the following Plaintiffs (hereinafter collectively, the "Non-Prevailing Plaintiffs") shall TAKE NOTHING by this action against the Defendant: Dinzel Graves, Sarah Morian & Michael Clark, Marc Favre-Massartic, Raja Gupta, Laura Lee & Dico Hassid, Peter & Adriana Oliver, Ed Follis, Frank & Jeanette Stokes. Steven Lin &Yi-Wen Michelle Pu, and Howard & Phyllis Epps. It is further

ORDERED, ADJUDGED, and FINALLY DECREED that all costs of court are taxed against the Defendant, except the costs of the depositions of Michael Clark, Marc Favre-Massartic, Raja Gupta, Laura Lee, Adriana Oliver, Ed Follis, Frank Stokes, Steven Lin, and Phyllis Epps,

1273

which are taxed against the Non-Prevailing Plaintiffs. It is further

ORDERED, ADJUDGED, and FINALLY DECREED that Plaintiffs' application for permanent injunction is DENIED.

All writs and processes for the enforcement and collection of the sums awarded by this Judgment or the costs of court may issue as necessary.

All relief not expressly granted herein is denied.

Signed this ____18th____ day of ____July____, 2014

_____
HON. RANDY WILSON
JUDGE PRESIDING

APPROVED AS TO FORM BUT RESERVING ALL COMPLAINTS AS TO SUBSTANCE:

By: /s/ Ramón G Viada III
_____
Ramón G. Viada III
Texas Bar No. 20559350
VIADA & STRAYER
17 Swallow Tail Court
The Woodlands, Texas 77381
(281) 419-6338
(281) 661-8887 (Fax)

COUNSEL FOR DEFENDANT

APPROVED AS TO FORM BUT RESERVING ALL COMPLAINTS AS TO SUBSTANCE:

By: /s/ Jean C. Frizzell
        Jean C. Frizzell
        Texas Bar No. 07484650
        REYNOLDS, FRIZZELL, BLACK, DOYLE,
        ALLEN AND OLDHAM LLP
        1100 Louisiana Street, 3500
        Houston, Texas 77002
        (713) 485-7200
        (713) 485-7250 (Fax)

        COUNSEL FOR PLAINTIFFS

4848-4110-8507, v. 2

1275

CAUSE NO. 2013-26155

| Penelope Loughhead, et al. | § | In the District Court of |
| | § | |
| v. | § | Harris County, Texas |
| | § | |
| 1717 Bissonnet, L.L.C. | § | 157th Judicial District |

## Opinion and Order

In November and December 2013, this case was tried to a jury. That jury found that a proposed high rise development at 1717 Bissonnet would constitute a nuisance if built to 20 of 30 plaintiff homeowners who lived near the proposed project. That same jury awarded damages to those 20 prevailing plaintiffs. The 20 prevailing plaintiffs have now moved this Court for a permanent injunction enjoining the defendant from constructing the project rather than awarding damages. For the reasons stated here and in defendant's opposition briefs, plaintiffs' request for a permanent injunction is denied. The Court instead enters judgment awarding partial damages to the prevailing plaintiffs and a take nothing judgment to the 10 plaintiffs who did not prevail.

## I.    Factual Background

This case involves a 1.6 acre tract located at 1717 Bissonnet (the "Property"). Since the early 1960's, Maryland Manor Apartments occupied the Property, ultimately growing to 67 units. In 2007, Buckhead Investment Partners acquired Maryland Manor and began plans to construct a 23 story multi-use development consisting of a five-level parking garage and 18 floors of apartments. On July 30, 2007, Buckhead filed its foundation and site work permit application with the City of Houston and on August 28, 2007, Buckhead advised the neighborhood association of its plans.[1] The neighborhood opposition was rapid and intense. A

---

[1] Defendant's Ex. 104.

FILED
Chris Daniel
District Clerk
MAY 1 2014

Time: _____
Harris County, Texas
By _____
Deputy

RECEIVED AND POSTED
District Clerk
MAY 01 2014
Harris County, Texas
By _____
Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1199

neighborhood group called Stop Ashby High Rise was created and signs in opposition to the Project appeared throughout the neighborhood.



The City of Houston initially approved the developer's Traffic Impact Analysis on September 4, 2007. However, on September 28, 2007, in response to neighborhood opposition, that approval was rescinded. Over the next several years, Buckhead revised its applications ten times; each time the application was rejected. In August 2009, Buckhead submitted a revised application under protest and subject to challenge of the project's previous denials.[2] On August 25, 2009, the City of Houston approved the revised project. Although the revised application was approved by the city, Buckhead continued to press for approval of the original application. In October 2009, Buckhead appealed the denial of its building permit to the City of Houston's General Appeals Board. The Appeals Board rejected the appeal and in December 2009, the Houston City Council upheld the decision of the Appeals Board. On April 9, 2010, Buckhead and Maryland Manor Associates filed suit against the city in federal court[3] complaining that Buckhead's previous applications were wrongfully denied. In February 2012, the City of Houston and Buckhead settled the federal action. In return for dismissing the lawsuit, the City of Houston agreed to approve the project provided the following changes were made:

- The project would be a 21 (rather than 23 as requested by Buckhead) story residential or mixed-use residential and commercial development on the Property with 228 residential high-rise units, 10,075 square feet of restaurant use, and four residential townhouses (the "Project");

---

[2] The revised project application called for a project that would generate only 120 p.m. peak hour automobile trips onto and off of Bissonnet. The original application, the denial of which Buckhead complained, would have generated a total of 184 p.m. peak hour trips.

[3] The action was originally filed in the 151st Dist. Court of Harris County, but was subsequently removed to federal court by the City of Houston.

2

- A pedestrian plaza must exist in the front of the Project with specified curb cuts on Ashby and Bissonnet;

- Traffic mitigation measures must be implemented including shuttle service and making bicycles available;

- Green wall screening must be constructed along the south and east walls of the parking garage;

- Lighting must be hooded or directed away from adjacent residences; and

- Noise mitigation must be implemented.[4]

This settlement agreement was publically announced on March 1, 2012.

## II.  Procedural Background

On January 14, 2013, Penelope Loughhead filed an action under Rule 202 of the Texas Rules of Civil Procedure to obtain pre-suit discovery about the construction plans for the Project. On March 4, 2013, this Court ordered defendant to provide certain construction information to plaintiff.

On May 1, 2013, six plaintiffs filed suit seeking damages and a permanent injunction to stop the Project.[5] Because of the previous Rule 202 suit, this action was transferred to this Court.[6]

Trial commenced on November 19, 2013[7] and ended with a jury verdict on December 17, 2013. The jury determined that the Project, if built, would constitute a nuisance to the owners of 20 of the 30 homes, but did not constitute a nuisance to owners of 10 homes. The jury awarded

---

[4] Defendant's Ex. 9.

[5] Over the next several months, many plaintiffs joined and exited the suit. At one point, there were more than 140 plaintiffs. However, many of those plaintiffs voluntarily withdrew their action. Ultimately, 45 plaintiffs representing 30 homes went to trial.

[6] Transferred by the Administrative Judge of the Civil Division pursuant to Harris County Local Rule 3.2.2.

[7] Because this controversy had lingered for six years, this Court placed the matter on an accelerated trial schedule in order to achieve a rapid resolution.

3

1201

damages to the homeowners of the twenty prevailing homes. A hearing was held on March 31, 2014 and April 21, 2014 to determine whether and what type of judgment should be entered.[8]

There are several motions pending before this Court. Defendant has filed a motion for entry of judgment, for judgment NOV and to disregard jury findings. Specifically, defendant requests that a take nothing judgment be entered against the homeowners of the ten homes who lost at trial and that the court enter a judgment notwithstanding the verdict with respect to the homeowners of the twenty homes who prevailed ("20 Prevailing Plaintiffs").

Similarly, plaintiffs have filed an application for permanent injunction. Plaintiffs are not seeking damages in the event the Project is built. Rather, plaintiffs seek an injunction enjoining construction of the Project as it is currently planned and permitted.

### III.   The Jury Verdict

Initial examination needs to be given to the jury verdict. The jury was asked whether the Project, if constructed, would constitute a nuisance to each plaintiff. Plaintiffs were numbered 1-30. (list attached as Ex. A) Generally speaking, plaintiffs immediately adjacent to the Project prevailed and those living farther away or to the



north lost. As this graphic demonstrates, plaintiffs in black (19, 21-23; and 25-30) lost at trial. Plaintiffs in yellow prevailed to varying degrees.

---

[8] That hearing was originally scheduled for January 23, 2014, but at the request of the parties was moved to March 31, 2014.

4

Additionally, the jury was asked to assess damages to the prevailing plaintiffs in two categories: (1) diminution of market value to plaintiffs' homes if the Project is built; and (2) loss of use and enjoyment of their property if the Project is built. The jury awarded the 20 Prevailing Plaintiffs approximately $1.2 million for diminution of property value and over $400,000 for loss of use and enjoyment of their property.

## IV.   Defendant's Motion for Judgment

As a threshold matter, defendant's motion for judgment against the plaintiffs in the ten homes who lost at trial is an easy and straightforward motion. That motion is granted. A take nothing judgment is entered against those plaintiffs.

## V.   Defendant's Motion for Judgment Notwithstanding the Verdict

A trial court may grant a motion for judgment notwithstanding the verdict if the evidence is legally insufficient to support the jury's findings. *Rocor Int'l, Inc. v. National Union Fire Ins. Co.*, 77 S.W.3d 253, 268 (Tex. 2002). Courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807.

The jury was asked the following question:

### Question No. 1:

> Is 1717 Bissonnet's proposed Project abnormal and out of place in its surroundings such that it will constitute a private nuisance if built?

> 1717 Bissonnet creates a "private nuisance" if its Project substantially interferes with Plaintiffs' use and enjoyment of their land.

> "Substantial interference" means that the Project must cause unreasonable discomfort or unreasonable annoyance to a person of ordinary sensibilities attempting to use and enjoy the person's land. It is more than a slight inconvenience or petty annoyance.

5

1203

A nuisance, if it exists, is not excused by the fact that it arises from an operation that is in itself lawful or useful.

Thus, to prove that the Project was a private nuisance, plaintiffs had to show that it would be "abnormal and out of place in its surroundings," and that it substantially interferes with Plaintiffs' use and enjoyment of their land. In support of this proposition, plaintiffs argued that the following factors constituted a nuisance:

- Increased traffic;

- Loss of privacy;

- Foundation damage to adjacent landowners due to settlement;

- Increased light to adjacent landowners;

- Construction annoyances; and

- Shadow cast by the Project with resulting vegetation damage.

The question of whether a lawful structure can constitute a nuisance is not a new or novel issue to jurisprudence. Texas courts have long grappled with landowners complaining that proposed structures on adjacent land would constitute a nuisance. For example, our supreme court observed that "there is no question that foul odors, dust, noise, and bright lights—if sufficiently extreme—may constitute a nuisance." *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004). *See also Bay Petroleum Corp. v. Crumpler*, 272 S.W.2d 318, 318-20 (Tex. 1963)(affirming jury verdict finding no nuisance since wind did not carry "obnoxious gases, fumes, odors and stenches" from gas-storage operations to plaintiffs' land in substantial quantities); *Parsons v. Uvalde Elec. Light Co.*, 106 Tex. 212, 163 S.W. 1, 1-2 (1914)(affirming jury verdict based on smoke, dust, and cinders from electric power plant); *Rosenthal v. Taylor, B. & H. Ry. Co.*, 79 Tex. 325, 15 S.W. 268, 269 (1891)(remanding nuisance claim base on stagnant water, noise, dust, smoke, and cinders caused by railroad operations).

6

1204

In this case, defendant analyzes each of the complained of activities and argues that each of them, standing alone, is insufficient to constitute a nuisance. Plaintiffs characterize this as a divide and conquer argument. The court agrees with plaintiffs. The nuisance cases in Texas demonstrate that all evidence, taken together, is to be considered in determining whether a nuisance exists. *See Freedman v. Briarcroft Property Owners, Inc.*, 776 S.W.2d 212, 270 (Tex. App.—Houston [14th Dist.] 1989, writ denied)("whether a nuisance exists is a question to be determined not merely by a consideration of the thing itself, but with respect to all attendant circumstances"); *Schneider, supra at 269* (foul odors, dust, noise and bright lights—if sufficiently extreme—may constitute a nuisance"); *GTE Mobilnet of South Texas, Ltd. v. Pascouet*, 61 S.W.3d 599, 615 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)(combination of noise and light constituted nuisance); *Lamesa Co-op Gin v. Peltier*, 342 S.W.2d 613, 616 (Tex. Civ. App.—Eastland 1961, writ ref'd n.r.e.)(loud noises, glaring lights, dust, odors, smoke and cotton lint combined to support nuisance finding).

The jury determined that the various complained of activities constituted a nuisance. There is sufficient evidence to support that finding. For the reasons stated in plaintiffs' response to defendant's motion for entry of judgment, for judgment NOV and to disregard jury findings, the jury's finding of nuisance will not be overturned.

## VI.  Damages v. Injunction

Affirming the jury's finding of nuisance is by no means the end of the inquiry. The court has, in effect, two options: permit the construction of the Project and award damages, or halt the Project and award no damages. Damages and an injunction are mutually exclusive. If an injunction is entered halting the Project, plaintiffs will suffer no damages. "Awarding both an injunction and damages as to future effects would constitute a double recovery." *Schneider,*

7

1205

*supra* at 284. Plaintiffs have made it clear that they want an injunction rather than damages. For the reasons stated in defendant's trial brief on balancing the equities and defendant's other briefs, plaintiffs' application for injunction is denied. Some of the reasons to deny the application are discussed here.

**Standards for Issuing an Injunction.** Even when a nuisance is established, a permanent injunction is not automatic. In *Story*, our supreme court stated:

> Petitioners take the position that the jury having found the facts constituting the nuisance, they were entitled to the injunction abating the plant as a matter of right. We do not agree. We think that there should have been a balancing of equities in order to determine if an injunction should have been granted.

*Storey v. Central Hide & Rendering Co.*, 226 S.W.2d 615, 618 (Tex. 1950). Rather, a permanent injunction can only be issued when plaintiffs establish:

(a) The existence of a wrongful act;

(b) The threat of imminent harm;

(c) The existence of irreparable injury; and

(d) The absence of an adequate remedy at law.

*GTE Mobilnet of S. Tex. Ltd. v. Pascouet*, 61 S.W.3d 599, 620 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Thus, the trial court must weigh "the respective conveniences and hardships of the parties and balance the equities." *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.). If they are issued, injunctions must be narrowly drawn and precise; injunctions cannot be so broad as to enjoin a defendant from activities which are a lawful and proper exercise of rights. *Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003).

While the jury determines fact questions, the trial judge must balance the equities in the role of chancellor to determine whether to issue an injunction. As one court stated:

8

It is not within the jury's province to pass upon the issue of whether or not the private nuisance which would result from the [proposed use of the defendant's property] will be outweighed by the public welfare. This is not a fact issue, but one to be determined by the chancellor in accordance with established equitable principles.

*Georg v. Animal Defense League*, 231 S.W.2d 807, 811 (Tex. Civ. App.—San Antonio 1950, writ ref'd n.r.e.). The balancing of the equities lies within the trial court's sound discretion. *Lee v. Bowles*, 397 S.W.2d 923, 926 (Tex. Civ. App.—San Antonio 1965, no writ). In short, Texas law places the responsibility on the trial court.

**Finding of Nuisance was Very Localized**. As noted earlier, only some of the plaintiffs prevailed at trial. Generally speaking, only those plaintiffs immediately adjacent to the project or in close proximity won. All plaintiffs north of the Project lost. The Project was not deemed a nuisance to any plaintiff more than approximately 200 feet from the Project.

While it's not possible to know precisely what the jury was thinking, even plaintiffs' counsel at closing arguments conceded that this finding suggests that the jury rejected the traffic and shadow concerns raised by plaintiffs. At the minimum, the jury's finding makes clear that the Project is a nuisance to only a small band of plaintiffs and does not extend to the entire community.

**Difficulty in Enforcing an Injunction**. Plaintiffs request an injunction precluding defendant from constructing the Project as permitted by the City. Thus, the injunction would preclude a mixed use 21 story building consisting of retail on the ground floor, a five story parking garage, and 16 floors of apartments. This Project and only this Project was found to be a nuisance to 20 homeowners. If defendant sought to construct a 20 story project, there would be no finding that such a building would be a nuisance. A new trial would have to be conducted to determine if such a building would be a nuisance. Similarly, suppose defendant desired to erect

9

a mid-rise six story structure that spanned property line to property line and had more units than the currently permitted Project? Would such a project be a nuisance? Such a mid-rise would solve the height concerns of the neighborhood, but might have worse privacy and traffic concerns.

Plaintiffs suggest that this Court should enjoin the Project as permitted and then, if defendant tries to skirt the injunction by building a slightly smaller building, conduct a contempt hearing to see if defendant is complying with the injunction. Unfortunately, plaintiffs' suggestion is no solution. If defendant reduced the size of the building just slightly, defendant would clearly not be violating plaintiffs' proposed injunction since defendant would not be constructing the project as permitted.

In short, an order enjoining the construction of the Project as permitted would not resolve this controversy. Rather, the Court would be faced with a potentially endless series of lawsuits or contempt motions testing whether various tweaks and revisions of the Project would be a nuisance or a violation of the injunction.

Some amicus briefs have suggested that the court should enter an injunction precluding defendant from building anything more than 6 or 7 stories in height. Unfortunately, there's absolutely no evidence from which this court can determine what height is appropriate and what height is inappropriate. The jury (at plaintiffs' request) was simply asked whether the Project as permitted was a nuisance. The jury was not asked and the plaintiffs did not request a finding of what height or number of units would be permissible. As a result, any attempt to issue an injunction restricting the building to a certain number of floors would be sheer guesswork. This Court is faced with an all or nothing proposition—either completely enjoin the building as permitted or not. Unfortunately, as previously noted, a complete ban doesn't solve the

10

controversy. Defendant can comply with the injunction by simply shaving one floor off of the project.

Far from resolving this controversy, plaintiffs concede a permanent injunction would result in more suits and motions, including possible contempt motions and new suits. The Texas Supreme Court stated that "judges may hesitate to issue discretionary orders that require extensive oversight." *Schneider, supra*, 147 S.W.3d at 287. "Difficulties in drafting or enforcing an injunction may discourage the trial judge from considering the imposition of an equitable remedy." *Id.* at 289.

In the end, this Project is a residential development in a residential neighborhood. Plaintiffs' opposition is primarily scale—plaintiffs argue the project is simply too big. It is not as if the court could enter an injunction ordering defendant not to build a certain type of business, e.g., racetrack or hide tanning facility. Courts can and have entered injunctions in the past against such facilities. This case is different. A two story residential development was on the Property for decades. Maryland Manor was of no concern to the neighbors but a two story structure too small for the developer. A 21 story residential development is believed by the neighbors (and the jury) to be too big. However, this Court has zero evidence with which to find what size is just right.

### Harm to the Defendant.

The defendant has fought for seven years to construct this Project. Neighborhood opposition slowed the City of Houston permitting process. Ultimately, after being faced with litigation, the City of Houston approved the Project with certain agreed modifications in order to help alleviate neighborhood concerns. During all of this time, defendant spent millions of dollars planning and designing the project. Indeed, while the neighbors fought and organized against the

11

1209

Project, no suit was filed. Even after the City approved the developers contested application, no suit was filed. More importantly, even after the City and the developers entered into a settlement agreement to permit the project to go forward, no suit was filed against the Project for over a year. Meanwhile, defendant continued to expend money and energy to go forward with the Project. Suit was not filed until May of 2013 against the Project. The delay in filing suit while defendant continued to spend money and, indeed, raze the Maryland Manor Apartments which generated cash flow, cannot be ignored.

One of the factors that must be considered by this Court is balancing the equities. To be sure, construction of the Project will cause some hardship and disruption to the plaintiffs. Enjoining the Project, however, will cause considerable hardship to defendant. While the defendant could sell the Property and recoup some of its losses, in no way could defendant come out whole. Defendant has considerable sunk costs in design and engineering fees. This effort and work cannot simply be picked up and moved to a new location. The injunction requested by plaintiffs would cause considerable hardship on defendant.

### Harm to the Community.

One of the factors that this Court must consider in determining whether to grant an injunction is harm to the public or community. As stated by our supreme court, the law of nuisance grew out of localized issues, such as a hog farm or tannery, "small-scale operations that like most others in pre-industrial England had little economic impact on anyone other than the parties." *Schneider, supra* at 287. Now, however,

> [i]ndustries and nuisances often come in much larger packages, with effects on the public, the economy, and the environment far beyond the neighborhood. A court sitting in equity today must consider those effects by balancing the equities before issuing any injunction. *Id.*

12

1210

If an injunction is granted, there is no question but that it will have a chilling effect on other development in Houston. For better or worse, the City of Houston has repeatedly opted against zoning. Houston's lack of zoning is often touted as part of the DNA of the city.

However, while there is not technically zoning, one witness testified that the City of Houston vigorously enforces its ordinances and codes. Obtaining a building permit is by no means a given. In this case, the defendant went through years of considerable effort to obtain approval for the Project. Ten different applications were made to the City. One project alternative was approved, litigation filed, and ultimately the 21 story Project was approved by the City.

If an injunction was issued, then a judge can become a one man zoning board with little criteria. Two different courts could examine two similar projects and reach contrary conclusions. Even after developers obtained a building permit, developers would have no idea whether a proposed project would pass judicial scrutiny. Moreover, while building codes and ordinances are quite detailed, the criteria of what constitutes a nuisance is considerably less specific. Here, the definition of nuisance is simply whether a project, if built, would be abnormal and out of place in its surroundings.

Currently, developers are faced with a lengthy permitting process where the rules are defined. If developers are confronted with a second step—a possibility of an injunction— developers might think twice about whether to proceed. This is particularly true since this second step, litigation and resulting appeals, would take years to complete.

As Houston becomes more and more urbanized and denser, perhaps Houston should reconsider whether zoning is appropriate for this City. That is not for this Court to decide.

13

1211

Rather, this Court must simply balance the equities. On balance, the Court concludes that an injunction should not be issued.

Does this mean that an injunction can never be issued to stop a proposed project? Of course not. But in weighing the equities in this case, the equities weigh toward no injunction.

Finally, the Project will provide benefits to the city as a whole. The Project will generate millions in tax revenues and provide housing for the medical center, Rice, and other urban destinations. While the Project might increase traffic along Bissonnet, it will contribute toward reduction in urban sprawl and congestion on freeways feeding the city center.

### City Approval.

Similarly, it must be remembered that the City of Houston approved this project and extracted concessions from the defendant in the process. As part of the settlement of the federal lawsuit, the city agreed to issue a permit for the project so long as defendant made certain design changes, including (a) reducing the height of the building from 23 to 21 stories; (b) imposing traffic, light and noise mitigation measures; and (c) green wall screening on the parking garage. While this procedure was not the same as zoning, this Court cannot ignore the fact that the city (a) approved the project; and (b) extracted concessions to help ameliorate many of the neighborhood concerns.

Defendant followed all of the rules required of the City.

### Other Projects Nearby.

Mid-rise buildings are sprouting up throughout the inner city. Indeed, two blocks from the proposed Project is a six story residential development at the corner of Ashby and Sunset and several four story residential developments are across the street on Sunset. Moreover, a six story

14

1212

medical office building is 2-3 blocks away on Sunset. Thus, this neighborhood is becoming dense even without this Project.

**Privacy Concerns Pre-dated the Project**. One of plaintiffs' concerns is that the Project, if it went forward, would permit an invasion of privacy into the plaintiffs' homes and back yards. This is a fact of life in urban settings. Any time a two story home is erected next door, the new neighbors will have an opportunity to peer into your back yard. Indeed, plaintiffs were subjected to such an invasion of privacy when Maryland Manor Apartments occupied the Property. Maryland Manor was razed in May 2013. However, prior to demolition, defendant took pictures

from second story apartments overlooking plaintiffs' property.[9] While plaintiffs testified that they had no privacy concerns with Maryland Manor, the pictures introduced at trial unquestionably show that Maryland Manor residents could look down into plaintiffs' property. If anything, privacy concerns from Maryland Manor could have been worse than






potential privacy concerns from the Project. Maryland Manor was literally inches from the property line, whereas the Project will be set back 10 feet. Maryland Manor had second story

---

[9] Defendant Ex. 2.

15

1213

apartments overlooking plaintiffs' back yards, whereas the Project will have a parking garage occupying the first five floors. Additionally, the Project's apartments will be located in a tower set back even farther. The potential nuisance concerns from the Project are not enough to justify an injunction stopping the Project.

### Adequate Remedy at Law.

One of the factors to be considered in deciding whether to grant an injunction is whether the plaintiffs have an adequate remedy at law, i.e., whether they can be compensated in damages.[10] The jury has weighed in on this issue and awarded damages to the plaintiffs. The jury determined that the prevailing plaintiffs' homes would be diminished in value by ranges of 3-15%.[11] One of plaintiffs' principal arguments at trial was that the Project would cause settlement and foundation damage to adjacent properties. Even if such foundation damage occurred, this is precisely the type of injury for which courts routinely award damages. Plaintiffs clearly have an adequate remedy at law.

### Other Factors to be Considered.

There are a couple of other factors that need to be identified, although they are of lesser importance.

**A. Some Plaintiffs Chose to Buy Homes in the Neighborhood Despite the Possibility of the Project being Built.** Several plaintiffs bought their homes during the pendency of the controversy from 2007 to the present. While the law is clear that this does not disqualify a plaintiff from obtaining damages for a proposed nuisance, *See, e.g., Galveston, H. & S.A. Ry. Co. v. Miller*, 93 S.W. 177, 179 (Tex. Civ. App. 1906, writ ref'd), it is a factor that cannot be

---

[10] Although §65.001 of the Texas Civil Practice and Remedies Code appears to abolish the requirement of showing irreparable injury, subsequent decisions hold that the irreparable injury requirement still exists. *See* Sonwalkar v. St. Luke's Sugar Land Partnership, LLP, 374 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

[11] Defendant's Ex. 166.

16

1214

ignored in determining whether to enjoin the Project. Even in the face of this project, some plaintiffs chose to move into the neighborhood.

**B. He who seeks equity must do equity.** An injunction is an equitable remedy. Courts have long held that he who seeks equity must do equity. *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). While most of the plaintiffs' conduct has been perfectly proper, there is no question but that many neighbors and some plaintiffs aggressively fought the project. Threats were made against the developers. Petitions were circulated that threatened to picket the homes of investors, appear at businesses and homes of contractors and service providers who work on the project, confront tenants in the neighborhood and let them know they are not welcome, boycott and demonstrate against any restaurant at the project as well as any other location of the same restaurant. In short, "we will appear at the homes of the owners, investors, and chef of your restaurant tenant and demonstrate our opposition to their presence in our neighborhood."[12]

## Conclusion on Injunction.

For the reasons stated here, and for the reasons stated in Defendant's briefing, the application for injunction is denied.

## VII. Damages

If an injunction is denied, and if the plaintiffs do indeed have an adequate remedy at law, then the final question for the court is what amount of damages to award. The jury was asked to determine what sum of money, if paid now in cash, would fairly and reasonably compensate plaintiffs for their damages in two areas: (a) loss of market value; and (b) loss of use and enjoyment of their property.

---

[12] Defendant Ex. 36.

1215

Defendant argues that the jury findings on both elements of damages should be disregarded because, among other reasons, the damages are not yet ripe and are speculative. The Court agrees in part and disagrees in part. Because the Project has not yet been constructed, the Court agrees that damages for loss of use and enjoyment should not be awarded at this time. Determination of the extent to which the Project may interfere with plaintiffs' use and enjoyment of their property is speculative until the project is constructed. *See Allen v. City of Texas City*, 775 S.W.2d 863 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

With respect to lost market value damages, however, the Court agrees with Plaintiffs that these damages have already occurred. Evidence was presented at trial that plaintiffs have already incurred lost market value damages as a result of the planned Project.

## VIII. Conclusion

This Court finds and orders as follows:

1. Defendant's Motion for Entry of Judgment with respect to the ten plaintiffs who lost at trial is granted;

2. Defendant's Motion for Judgment Notwithstanding the Verdict is Denied;

3. Defendant's Motion to Disregard Jury Findings is Granted with respect to loss of use and enjoyment damages and denied with respect to loss of market value damages;

4. Plaintiffs' Application for Permanent Injunction is denied.

5. The parties are to prepare a judgment consistent with this opinion.

Signed May 1, 2014.

Hon. Randy Wilson
Judge 157th Dist. Court

18

1216

## Ex. A

1. Luong Nguyen, 1750 Wroxton Ct.
2. Lam Nguyen & Katherine Hoang, 1801 Bissonnet
3. Jamie Flatt, 1740 Wroxton Ct.
4. Penelope Loughhead, 1736 Wroxton Ct.
5. Donald Verplancken, 1734 Wroxton Ct.
6. Norman & Suannah Rund, 1726 Wroxton Ct.
7. Achim & Diana Bell, 5300 Southhampton Estates
8. Jeanne Meis, 5302 Southhampton Estates
9. Mary Van Dyke, 5304 Southhampton Estates
10. Ralph & Leslie Miller, 5306 Southhampton Estates
11. Yin & Surong Zhang, 5310 Southhampton Estates
12. Martha Gariepy, 5308 Southhampton Estates
13. Stephen Roberts, 1804 Wroxton Rd.
14. Suzanne Powell, 5305 Southhampton Estates
15. Michelle Jennings & Dr. Michael Tetzlaff, 5309 Southhampton Estates
16. James & Allison Clifton, 1714 Wroxton Ct.
17. Kimberley Bell, 1729 Wroxton Ct.
18. Richard & Mary Baraniuk, 1731 Wroxton Ct.
19. Dinzel Graves, 5219 Dunlavy
20. Kenneth Reusser & Xanthi Couroucli, 1801 Wroxton Rd.
21. Sarah Morian & Michael Clark, 1810 Bissonnet
22. Marc Favre-Massartic, 1812 Bissonnet
23. Raja Gupta, 1808 Wroxton Rd.
24. Earle Martin, 1811 Wroxton Rd.
25. Laura Lee & Dico Hassid, 1731 South Blvd.
26. Peter & Adriana Oliver, 5219 Woodhead
27. Ed Follis, 1823 Bissonnet
28. Frank & Jeanette Stokes, 1826 Wroxton Rd.
29. Steven Lin & Dr. Yi-Wen Michelle Pu, 1710 South Blvd.
30. Howard & Phyllis Epps, 1936 Wroxton Rd.

19

1217


CAUSE NO. 2013-26155

| | | |
|---|---|---|
| **Penelope Loughhead, et al.** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **v.** | § | **HARRIS COUNTY, T E X A S** |
| | § | |
| **1717 Bissonnet, LLC** | § | **157ᵗʰ JUDICIAL DISTRICT** |

**FILED**
Chris Daniel
District Clerk
*Time:*
*By*
DEC 17 2013
Harris County, Texas
Deputy

## CHARGE OF THE COURT

**Members of the Jury:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I have given you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

730

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses

who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

## Definitions

A. Plaintiffs mean the property owners who are plaintiffs in this action:

1. Luong Nguyen, 1750 Wroxton Ct.
2. Lam Nguyen & Katherine Hoang, 1801 Bissonnet
3. Jamie Flatt, 1740 Wroxton Ct.
4. Penelope Loughhead, 1736 Wroxton Ct.
5. Donald Verplancken, 1734 Wroxton Ct.
6. Norman & Suannah Rund, 1726 Wroxton Ct.
7. Achim & Diana Bell, 5300 Southhampton Estates
8. Jeanne Meis, 5302 Southhampton Estates
9. Mary Van Dyke, 5304 Southhampton Estates
10. Ralph & Leslie Miller, 5306 Southhampton Estates
11. Yin & Surong Zhang, 5310 Southhampton Estates
12. Martha Gariepy, 5308 Southhampton Estates
13. Stephen Roberts, 1804 Wroxton Rd.
14. Suzanne Powell, 5305 Southhampton Estates
15. Michelle Jennings & Dr. Michael Tetzlaff, 5309 Southhampton Estates
16. James & Allison Clifton, 1714 Wroxton Ct.
17. Kimberley Bell, 1729 Wroxton Ct.
18. Richard & Mary Baraniuk, 1731 Wroxton Ct.
19. Dinzel Graves, 5219 Dunlavy
20. Kenneth Reusser & Xanthi Couroucli, 1801 Wroxton Rd.
21. Sarah Morian & Michael Clark, 1810 Bissonnet
22. Marc Favre-Massartic, 1812 Bissonnet
23. Raja Gupta, 1808 Wroxton Rd.
24. Earle Martin, 1811 Wroxton Rd.
25. Laura Lee & Dico Hassid, 1731 South Blvd.
26. Peter & Adriana Oliver, 5219 Woodhead
27. Ed Follis, 1823 Bissonnet
28. Frank & Jeanette Stokes, 1826 Wroxton Rd.
29. Steven Lin & Dr. Yi-Wen Michelle Pu, 1710 South Blvd.
30. Howard & Phyllis Epps, 1936 Wroxton Rd.

B. "1717 Bissonnet" means the defendant 1717 Bissonnet, LLC.

C. The "Project" means the 21-story mixed-use building that 1717 Bissonnet proposes to construct at the corner of Bissonnet Road and Ashby St.

.

**Question No. 1:**

Is 1717 Bissonnet's proposed Project abnormal and out of place in its surroundings such that it will constitute a private nuisance if built?

1717 Bissonnet creates a "private nuisance" if its Project substantially interferes with Plaintiffs' use and enjoyment of their land.

"Substantial interference" means that the Project must cause unreasonable discomfort or unreasonable annoyance to a person of ordinary sensibilities attempting to use and enjoy the person's land. It is more than a slight inconvenience or petty annoyance.

A nuisance, if it exists, is not excused by the fact that it arises from an operation that is in itself lawful or useful.

Answer "Yes" or "No" for each plaintiff:

| | Plaintiff | Answer |
|---|---|---|
| 1. | Luong Nguyen<br>1750 Wroxton Ct. | Yes |
| 2. | Lam Nguyen & Katherine Hoang<br>1801 Bissonnet | Yes |
| 3. | Jamie Flatt<br>1740 Wroxton Ct. | Yes |
| 4. | Penelope Loughhead<br>1736 Wroxton Ct. | yes |
| 5. | Donald Verplancken<br>1734 Wroxton Ct. | yes |
| 6. | Norman & Suannah Rund<br>1726 Wroxton Ct. | yes |
| 7. | Achim & Diana Bell<br>5300 Southhampton Estates | yes |
| 8. | Jeanne Meis<br>5302 Southhampton Estates | yes |
| 9. | Mary Van Dyke<br>5304 Southhampton Estates | Yes |

10. Ralph & Leslie Miller
5306 Southhampton Estates — Yes

11. Yin & Surong Zhang
5310 Southhampton Estates — Yes

12. Martha Gariepy
5308 Southhampton Estates — Yes

13. Stephen Roberts
1804 Wroxton Rd. — Yes

14. Suzanne Powell
5305 Southhampton Estates — Yes

15. Michelle Jennings & Dr. Michael Tetzlaff
5309 Southhampton Estates — Yes

16. James & Allison Clifton
1714 Wroxton Ct. — Yes

17. Kimberley Bell
1729 Wroxton Ct. — Yes

18. Richard & Mary Baraniuk
1731 Wroxton Ct. — Yes

19. Dinzel Graves
5219 Dunlavy — No

20. Kenneth Reusser & Xanthi Couroucli
1801 Wroxton Rd. — Yes

21. Sarah Morian & Michael Clark
1810 Bissonnet — No

22. Marc Favre-Massartic
1812 Bissonnet — No

23. Raja Gupta
1808 Wroxton Rd. — No

24. Earle Martin
1811 Wroxton Rd. — Yes

25. Laura Lee & Dico Hassid
    1731 South Blvd.                              NO

26. Peter & Adriana Oliver
    5219 Woodhead                                 NO

27. Ed Follis
    1823 Bissonnet                                NO

28. Frank & Jeanette Stokes
    1826 Wroxton Rd.                              NO

29. Steven Lin & Dr. Yi-Wen Michelle Pu
    1710 South Blvd.                              NO

30. Howard & Phyllis Epps
    1936 Wroxton Rd.                              NO

735

Answer Question 2 if you answered "Yes" for any plaintiff in Question No. 1. Answer only with respect to those plaintiffs, if any, for whom you answered "Yes" in Question No. 1. Otherwise, do not answer Question No. 2.

## Question No. 2:

What sum of money, if paid now in cash, would fairly and reasonably compensate plaintiffs for their damages, if any, proximately caused by the nuisance?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

1. Loss of Market Value. Consider the difference in market value of each plaintiff's property caused by the nuisance. Market value means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

2. Loss of Use and Enjoyment of the Property.

Answer separately, in dollars and cents, for damages, if any.

| | Plaintiff | Loss of Market Value Answer | Loss of Use & Enjoyment Answer |
|---|---|---|---|
| 1. | Luong Nguyen<br>1750 Wroxton Ct. | $88,050 | 17620.20 |
| 2. | Lam Nguyen & Katherine Hoang<br>1801 Bissonnet | 25932.25 | 25,932.25 |
| 3. | Jamie Flatt<br>1740 Wroxton Ct. | 84,888 | 21,222 |
| 4. | Penelope Loughhead<br>1736 Wroxton Ct. | 90,288 | 22,572 |
| 5. | Donald Verplancken<br>1734 Wroxton Ct. | 72,252 | 18,063 |
| 6. | Norman & Suannah Rund<br>1726 Wroxton Ct. | 96,630 | 24,157.50 |
| 7. | Achim & Diana Bell<br>5300 Southhampton Estates | 80,471.04 | 20,117.76 |

| | | | |
|---|---|---|---|
| 8. | Jeanne Meis<br>5302 Southhampton Estates | 79,891.20 | 19,972.80 |
| 9. | Mary Van Dyke<br>5304 Southhampton Estates | 88,680.60 | 17,736.12 |
| 10. | Ralph & Leslie Miller<br>5306 Southhampton Estates | 94,528.80 | 18,905.76 |
| 11. | Yin & Surong Zhang<br>5310 Southhampton Estates | 102,483.00 | 20,496.60 |
| 12. | Martha Gariepy<br>5308 Southhampton Estates | 88,065.00 | 17613.00 |
| 13. | Stephen Roberts<br>1804 Wroxton Rd. | 47693.50 | 47,693.50 |
| 14. | Suzanne Powell<br>5305 Southhampton Estates | 20,191.68 | 13,461.12 |
| 15. | Michelle Jennings & Dr. Michael Tetzlaff<br>5309 Southhampton Estates | 17,613.00 | 11,742.00 |
| 16. | James & Allison Clifton<br>1714 Wroxton Ct. | 29,850.30 | 19,900.20 |
| 17. | Kimberley Bell<br>1729 Wroxton Ct. | 24,097.50 | 16,065.00 |
| 18. | Richard & Mary Baraniuk<br>1731 Wroxton Ct. | 21,596.04 | 14,397.36 |
| 19. | Dinzel Graves<br>5219 Dunlavy | 0 | 0 |
| 20. | Kenneth Reusser & Xanthi Couroucli<br>1801 Wroxton Rd. | 33,636.69 | 33,636.69 |
| 21. | Sarah Morian & Michael Clark<br>1810 Bissonnet | 0 | 0 |
| 22. | Marc Favre-Massartic<br>1812 Bissonnet | 0 | 0 |

737

| | | | |
|---|---|---|---|
| 23. | Raja Gupta<br>1808 Wroxton Rd. | 0 | 0 |
| 24. | Earle Martin<br>1811 Wroxton Rd. | 36,923.58 | 36,923.58 |
| 25. | Laura Lee & Dico Hassid<br>1731 South Blvd. | 0 | 0 |
| 26. | Peter & Adriana Oliver<br>5219 Woodhead | 0 | 0 |
| 27. | Ed Follis<br>1823 Bissonnet | 0 | 0 |
| 28. | Frank & Jeanette Stokes<br>1826 Wroxton Rd. | 0 | 0 |
| 29. | Steven Lin & Dr. Yi-Wen Michelle Pu<br>1710 South Blvd. | 0 | 0 |
| 30. | Howard & Phyllis Epps<br>1936 Wroxton Rd. | 0 | 0 |

**Presiding Juror:**

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

   a.   have the complete charge read aloud if it will be helpful to your deliberations;
   b.   preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;
   c.   give written questions or comments to the bailiff who will give them to the judge;
   d.   write down the answers you agree on;
   e.   get the signatures for the verdict certificate; and
   f.   notify the bailiff that you have reached a verdict.

   Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate:**

1. Unless otherwise instructed you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict.

   If 11 jurors agree on every answer, those 11 jurors sign the verdict.

   If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

   Do you understand these instructions? If you do not, please tell me now.

_____
Judge Presiding

739

## Verdict Certificate

Check one:

__X__ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_[signature]_                                    Colin A. Tait

Signature of Presiding Juror                    Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

|  | SIGNATURE | NAME PRINTED |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |

740

Table 4: Building Impact Categories.

| Category | Severity of Impact | Description of Typical Impact (Ease of repair is in bold font) | Crack width (mm) |
|---|---|---|---|
| 0 | Negligible | Hairline cracks | < 0.1 |
| 1 | Very Slight | Fine cracks that can easily be treated during normal decoration. Perhaps isolated slight fracture in buildings. Cracks in external brickwork visible on inspection. | ≤ 1 |
| 2 | Slight | Cracks easily filled. Redecorating probably required. Several slight fractures showing inside of building. Cracks are visible externally and some repainting may be required externally to ensure weather tightness. Doors and windows may stick slightly | ≤ 5 |
| 3 | Moderate | The cracks require some opening up and can be patched by a mason. Recurrent cracks can be masked by suitable linings. Repainting of external brickwork and possibly a small amount of brickwork to be replaced. Doors and windows sticking. Service pipes may fracture. Weather tightness often impaired. | 5-15 or number of cracks> 3 |
| 4 | Severe | Extensive repair work involving breaking out and replacing sections of walls, especially over doors and windows. Windows and door frames distorted, floor sloping noticeably. Walls leaning and bulging noticeably, some loss of bearing in beams. Service pipes disrupted. | 15-25 but depends on number of cracks |
| 5 | Very Severe | This requires a major repair job involving partial or complete rebuilding. Beams lose bearing, walls lean badly and require shoring. Windows broken due to distortion. Danger of instability | Usually > 25 |

Based on the system developed by Burland and Wroth (1975).



PLAINTIFF'S EXHIBIT
361
tabbies

# Damage Impact to Homes



**Legend:**
- Severe to very severe damage
- Moderate damage

**Bell** — 5300 Southampton

**Meis** — 5302 Southampton

**Van Dyck** — 5304 Southampton

**Miller** — 5306 Southampton

**Gariepy** — 5308 Southampton

**Zhang** — 5310 Southampton

**Nguyen** — 1750 Wroxton Ct.

**Flatt** — 1740 Wroxton Ct.

**Loughhead** — 1736 Wroxton Ct.

**Verplancken** — 1734 Wroxton Ct.

PLAINTIFF'S EXHIBIT
363
tabbies